[No. D027060. Fourth Dist., Div. One. Dec. 10, 1998.]

SAN DIEGO HOUSING COMMISSION et al., Plaintiffs and Respondents, v.
INDUSTRIAL INDEMNITY COMPANY, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

528

COUNSEL

Edwards, Sooy & Byron and Thomas W. Byron for Defendant and Appellant.

Suzanne R. Varco, Detisch & Christensen, Charles B. Christensen and Lydia Brashear for Plaintiffs and Respondents.

OPINION

HUFFMAN, J.—This action by plaintiffs and respondents San Diego Housing Commission and San Diego Housing Authority (collectively, Housing; respectively, the Commission and the Authority) against insurer Industrial Indemnity Company (IIC) arose out of an underlying default judgment for damages for construction defects that Housing obtained against John B. Reed Construction Co. (JBR), whom IIC insured under a liability policy. (San Diego Housing Authority v. John B. Reed Construction Co. (Super. Ct. San Diego County, 1992, No. 651235) (the underlying action).) In 1983 through 1984, JBR was the general contractor for a low-income housing project, Calle Primera (the project), built for the Commission on land owned by the Authority, and funded by the federal Department of Housing and Urban Development (HUD). As the property owner where the project was built, Housing was an additional insured on JBR's liability policy issued by IIC.

The project was completed and inspected by officials of the City of San Diego (City) and HUD in March and April 1984; tenants began moving in

beginning April 4, 1984. Beginning in 1989 and 1990, tenants made complaints to Housing concerning problems with the flooring, plumbing, drainage, and lighting systems at the project. Housing made repairs on an ongoing basis and eventually filed the underlying action on construction defect theories against JBR. JBR, which was not in good corporate standing due to nonpayment of taxes, did not defend the suit, after it unsuccessfully sought to have its insurer IIC defend it. Housing then obtained a default judgment against JBR for $1,150,603.92.

Armed with the judgment, Housing brought this action against IIC and related entities under Insurance Code section 11580, subdivision (b)(2) as a third party beneficiary of the insurance policy, seeking to obtain coverage of all or a portion of the default judgment in the underlying action and related relief.[2] Based on its status as an additional insured under the liability policy, Housing also separately pled two contract-based theories, breach of contract and tortious breach of duty imposed by the contractual implied covenant of good faith and fair dealing (bad faith).

After extensive pretrial litigation, all three of these theories were presented to a jury, which rendered special verdicts finding property damage under the policy's coverage and other damages. The resulting judgment awarded Housing a total of $1,033,241.58, including $400,000 in indemnity dollars due to policy coverage, as well as related fees and costs arising out of both the underlying action and the current action. We attach this judgment as appendix A.

IIC now appeals the judgment, chiefly contending there is no basis for contractual or bad faith liability on its part as to Housing because there was no underlying claim made or suit filed against Housing by third party claimants such as would result in contractual liability coverage or claims processing duties that were breached. IIC also argues the judgment is unsupported on the section 11580, subdivision (b)(2) theory, due to a supposed lack of any liability coverage for any occurrence of property damage within the policy period arising out of construction defects at the project. Further, IIC contends the trial judge erroneously determined that the policy limits here were $400,000, as opposed to $100,000, if there were coverage; other related IIC contentions will be described in our discussion, *post*.

---

[2]All further statutory references are to the Insurance Code unless otherwise specified. The additional defendants named, Crum & Forster Insurance Risk Management Accounts, are related entities to IIC and were not separately represented at trial; they are not involved in this appeal.

As we will explain, IIC meritoriously contends that the breach of contract and bad faith theories were inappropriately presented to the jury, and the judgment must be reversed on that basis. Further, the presentation of evidence on those theories was prejudicial to IIC on the remaining valid theory pled against it, liability under section 11580, subdivision (b)(2), and that theory is subject to retrial on remand. We reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The Authority owns the San Ysidro land on which the 70-unit housing project was constructed; the Commission planned and administers the project. Each is a public agency authorized by statute and ordinance. (Health & Saf. Code, §§ 34240; 34291; San Diego Mun. Code, § 98.0301.) When the Commission accepts HUD funds for the construction of public housing projects, it agrees to assure that the housing is safe, decent, and sanitary, in part by including lease provisions to that effect. (42 U.S.C. §§ 1437b(a), 1437d(l)(2).) The Authority contracted with JBR as general contractor for the project; JBR accomplished the work mainly through the use of subcontractors.

At the outset of construction, JBR was insured by IIC under a comprehensive general liability insurance (CGL) policy that had a three-year term beginning June 11, 1981, and due to end June 11, 1984. A certificate of coverage was issued for this project March 30, 1983. The policy provided broad form property damage coverage and required an occurrence within the policy period for coverage to attach. Completed operations coverage was provided, and there was an exclusion for property damage to the project occurring during the course of construction. A "Separate Limit Plan" was supplied to provide different policy limits for different types of coverage, although the general policy limit for property damage was $100,000 per occurrence. A supplementary payment provision dealt with costs taxed against the insured in any suit defended by the company. Housing was a named additional insured.

During construction, JBR and its subcontractors dealt with several problems, including sloping floors that had to be corrected, concrete that had to be redone, and drainage problems that needed further work. Copper plumbing pipes were installed in rocky areas with mildly corrosive soil; they passed pressure tests before project completion. The exterior door design allowed the doors, when opened, to break nearby light fixtures until chains were installed to provide doorstops.

In March 1984, as construction was wrapping up, JBR's principal, J. Michael Reed, decided to cancel the policy to save on premiums, as JBR had

no other pending projects. He notified Housing, an additional insured on the policy, that the policy would be canceled, and Housing officials requested that the insurance be maintained through project completion. JBR's insurance agent was told at a JBR/Housing meeting that coverage should remain in place until completion, and sent a notice of cancellation to JBR giving its cancellation date as March 18, 1984. This notice also shows a cancellation date of March 30, 1984, as to "Cert. Holders 30 days." A policy release statement signed by JBR's principal Reed and admitted into evidence as exhibit 78 shows the effective date of cancellation as March 18, 1984.

Regarding cancellation of the policy as to the additional insured Housing, JBR's insurance agent, Robert Hallock of the Barney & Barney firm, wrote a letter dated March 8, 1984, to a Housing official, project manager Flavian Geis, to notify Housing that the JBR policy was canceled and revised effective March 18, 1984, and giving 30 days' notice. The letter stated that if the job was not accepted prior to the cancellation date of March 18, 1984, Housing's insurance rights would extend to April 7, 1984. At trial, Geis stated he never received such a letter, and it is not clear if it was ever sent.

Housing officials signed off on the project on March 30, 1984, as being completed as of April 4, 1984. HUD approval of completion was given June 25, 1984.

Tenants began to move in April 4, 1984. According to the underlying construction defect complaint against JBR, defects at the site were discovered around April 1989, such as plumbing and drainage problems, door and light fixture problems, uneven floors, cracked stucco, and other problems. Around 1989 to 1990, Housing's technical services supervisor and maintenance coordinator began to receive such complaints and to do repairs. Housing notified JBR of the defects in February 1992 and then filed its complaint for damages for construction defects April 27, 1992.

From February to May 1992, JBR attempted to obtain a defense of the construction defect action from IIC. JBR, which had not paid its corporate taxes, tendered a sum to do so to IIC if it would provide a defense, but IIC refused, citing its policy interpretation that there was no occurrence or property damage within the policy period, which it said ended March 18, 1984 (after JBR's cancellation). On June 2, 1992, Housing's attorney wrote a letter to IIC, attaching a copy of its complaint against JBR and seeking to claim benefits under the policy for property damage caused by JBR and its subcontractors. No allegation was made that any "claims" had been made against Housing (i.e., it had not been sued by the tenants or HUD regarding

the conditions at the property). However, Housing pled in the underlying complaint that it had the duty to maintain the project in a safe and sanitary condition, and it also had responsibilities to HUD to maintain the project in connection with its federal funding.[3]

In March 1994, Housing obtained the $1,150,603.92 default judgment against JBR, which included repair costs, relocation costs, expert witness fees, and attorney fees and costs (less credits for settlements received from subcontractors). In December 1994, Housing filed this action against IIC, including a cause of action as a judgment creditor to recover on the policy, subject to its terms and limitations. (§ 11580, subd. (b)(2).) Housing also sought damages on a breach of contract theory, alleging that the denial of coverage for its claims of property damage was a breach of contract and damages were incurred in the amount of the underlying JBR default judgment. In the bad faith cause of action, Housing alleged IIC had not definitively answered its requests for indemnification under the policy until June 1994, and then denied them without an adequate investigation and without sufficient cause. However, Housing alleged that occurrences manifested themselves during the 1983-1984 policy period.

After extensive pretrial litigation,[4] the matter went to jury trial in January 1996. *In limine*, and also by nonsuit motion and a reconsideration motion, IIC sought to preclude Housing from presenting evidence on the breach of contract and bad faith theories. It argued that Housing's only legally viable theory was under section 11580, subdivision (b)(2) as a judgment creditor, since no claims had been made against Housing by either the tenants or HUD in the form of a legal action or claim against the policy. The trial court considered these arguments a number of times during the trial and eventually allowed all three theories to go to the jury, reasoning that public policy should not require an underlying action to be filed in order for liability coverage to exist. Extensive evidence was taken about conditions and

---

[3]The basis of Housing's asserted contractual duty to maintain the project is the tenant leases. (42 U.S.C. § 1437d(*l*)(2).) The basis of the asserted statutory duty to do so is Government Code section 815.6, exposing a public entity that is under a mandatory duty to protect against a particular kind of injury to liability for failure to discharge that duty. Also, Housing asserts that the Commission owes duties to its sister entity the Authority to maintain the premises, and both owe duties to the public to enforce the uniform building code.

[4]Several demurrers were resolved and a summary judgment denied in the trial court. This court denied a petition for writ of mandate to challenge one of the rulings on demurrer. (*Industrial Indemnity Co.* v. *Superior Court* (May 16, 1995) D023320 [nonpub. opn.].) It should also be noted that a Code of Civil Procedure section 998 offer of $750,000 was made by Housing but rejected by IIC.

building code violations at the property, and expert opinion on needed repairs was presented, with a Housing repair estimate set at $993,527.[5]

Both parties presented percipient and expert witnesses on IIC's claims handling and investigation practices. Housing examined as adverse witnesses IIC's claims representatives Robert Blake and Joe Jenny, as well as JBR's insurance agent Robert Hallock, and Robert Lewis, the director of claims for Crum & Forster, IIC's affiliate. Housing brought out evidence showing IIC's delay in providing Housing with a copy of the policy, IIC's inaccurate representations of the terms of the policy, the amounts of coverage, and the cancellation date, and IIC's failure to follow its own procedures for investigations and claims processing. Housing's expert insurance witnesses Earl Straily and Fritz Daviscourt opined IIC had not acted in good faith toward Housing. IIC presented its own expert witnesses to combat the bad faith theories.[6]

At the close of testimony, the jury was instructed, inter alia, that it should determine whether property damage (not "appreciable" property damage, as IIC argued was appropriate) had occurred during the policy period. It rendered separate special verdicts on the section 11580, subdivision (b)(2) cause of action ($955,537 total) and the breach of contract/bad faith theories ($810,104 total; no double recovery was allowed). The special verdicts made the same basic factual findings as to the types and amounts of property damage that had occurred during the policy period.[7] Relocation costs and attorney and expert fees and costs incurred in connection with the underlying default judgment were also awarded. No noncooperation by JBR with its insurer was found, while bad faith on the part of IIC was found. (See appen. A.)

At posttrial proceedings, the trial court set the policy limits of coverage at $400,000, based on a policy interpretation and a finding that two annual policy periods were involved, and the separate limits provision of the policy allowed $100,000 aggregate awards in each of two categories (property

---

[5] As of the time of trial, $115,000 had been spent by Housing on repairs at the project.

[6] Housing contends IIC invited any error on the bad faith theory by presenting its own witnesses on that topic. However, it was appropriate for IIC to present evidence to controvert Housing's claims in that respect. (*Hoel* v. *City of Los Angeles* (1955) 136 Cal.App.2d 295, 310 [288 P.2d 989].) It should also be noted that Housing made an effort to show that IIC, its agent Barney & Barney, and JBR had tried to prevent Housing from obtaining coverage under the construction bond provided by IIC.

[7] Although the underlying action against JBR had alleged many different types of construction defects, the jury in this case found that only four constituted covered property damage: drainage, plumbing, floor, and exterior lights problems. The coverage questions presented in this action pertain only to those particular defects. (Appen. A.)

damage occurring in the course of operations performed for the insured by independent contractors, etc., and property damage included within the completed operations hazard). The judgment included an award of attorney and expert fees and costs incurred in the present action, as well as in the underlying action on a bad faith damages theory (*Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]). (See Appen. A.) IIC's motions for new trial and judgment notwithstanding the verdict were denied and it appeals.

## DISCUSSION

In part I of this opinion, we discuss the nature of Housing's claims against IIC on this liability policy, and find there was no adequate legal foundation for sending the breach of contract and bad faith causes of action to the jury. We then determine that prejudice to IIC occurred due to the jury's consideration of the bad faith and contract evidence in connection with the section 11580, subdivision (b)(2) claim, pursuant to the policy interpretation which prevailed during trial.

In part II [nonpub.], we discuss the relevant rules for determining on remand IIC's liability, if any, to Housing, in its capacity as a judgment creditor, for covered property damage under the policy. (§ 11580, subd. (b)(2).)

## I

### *Breach of Contract and Bad Faith Claims*

■ An insured can pursue a breach of contract theory against its insurer by alleging the insurance contract, the insured's performance or excuse for nonperformance, the insurer's breach, and resulting damages. (*Reichert* v. *General Ins. Co.* (1968) 68 Cal.2d 822, 830 [69 Cal.Rptr. 321, 442 P.2d 377].) Housing initially claimed to be pursuing such a breach of contract theory as a first party insured (i.e., an additional insured) under the contract of insurance; its bad faith claims were similarly contract/covenant-based. (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 35-36 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

However, as trial went on, the court and counsel clarified that Housing was not pursuing any claimed rights under a first party or property insurance rights theory, but rather was solely seeking coverage as an additional insured under the liability insurance policy pursuant to its claim to IIC for property damage payments and/or payment of the JBR default judgment amount. (Of

course, it was also pursuing its section 11580, subdivision (b)(2) cause of action as a judgment creditor on the JBR default judgment.) In the breach of contract portion, it was arguing that since it was forced to respond to tenant complaints and since it had various statutory and contractual duties to fix the problems at the project, then, effectively, claims had been made against it which it then converted into its own claim for indemnification by IIC as an additional insured. At trial, Housing's counsel characterized this argument as follows: "It is a third-party claim. We are suing as a third-party claim. We are a first party to the insurance contract, we're an insured. And we are suing for breach of that policy for failure to indemnify as a result of that third-party claim. Those are the tenants out there. Those are the claims that have been made."

Housing further finds fault with IIC's processing of this claim, alleging its bad faith breach of covenant theory. To distinguish among the various theories, the trial court instructed the jury as follows:

"Plaintiffs are seeking damages based on the following claims: One, that Insurance Code Section 11580[, subdivision] [(b)(2)] provides insurance coverage and payments as to the San Diego Housing Commission and Housing Authority as a result of the judgment that they previously obtained against John B. [Reed] Construction Company; or, two, that Industrial Indemnity breached its contract of insurance and breached the implied covenant of good faith and fair dealing as to the San Diego Housing Commission and the Housing Authority.

"The plaintiffs have the burden of proving by a preponderance of the evidence all of the facts necessary to establish:

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"Breach of contract: One, that the insurance contract provides coverage for the San Diego Housing Commission, Housing Authority and John B. [Reed] Construction Company; two[,] that Industrial Indemnity breached that agreement; three, that the San Diego Housing Commission and Housing Authority are liable to third parties, including tenants, HUD, and in the case of the San Diego Housing Commission to the Housing Authority; four, that the breach caused damages to the Commission and the Authority; five[,] the amount of the damages.

"Bad faith: One, that as to the claim of bad faith the Housing Authority and the Housing Commission have the duty of proving that Industrial Indemnity breached the implied covenant of good faith and fair dealing; two,

that by reason of this breach the San Diego Housing Commission and the Housing Authority have been damaged."[8]

To analyze the arguments on appeal, we first look at the nature of liability insurance coverage, as distinguished from first party coverage. We then examine the policy definitions of "suits" that must be defended and "claims" that may be investigated and settled. We then address the nature of the actual claims made in the context of the policy requirements.

A

*First versus Third Party Policies*

In *Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose*), the Supreme Court set out the relevant definitions of the two types of policies:

"[A] first party insurance policy provides coverage for loss or damage sustained directly by the insured (e.g., life, disability, health, fire, theft and casualty insurance). A third party liability policy, in contrast, provides coverage for liability of the insured to a 'third party' (e.g., a CGL policy, a directors and officers liability policy, or an errors and omissions policy). In the usual first party policy, the insurer promises to pay money to the insured upon the happening of an event, the risk of which has been insured against. In the typical third party liability policy, the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by the insured. [Citation.]

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . '[T]he right to coverage in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty. This liability analysis differs substantially from the coverage analysis in the property insurance context, which draws on the relationship between perils that are either covered or excluded in the contract. In liability insurance, by insuring for personal liability, and agreeing to cover the insured for his own negligence, the insurer agrees to cover the insured for a broader spectrum of

---

[8]Housing argues on appeal that IIC failed to pursue sufficient objections to the Housing theory of trial on the breach of contract and bad faith theories, by not making objections at opening and closing arguments. The record is replete with IIC's efforts to seek a ruling favorable to it on these theories, all of which were rebuffed by the trial court. IIC has sufficiently preserved these issues on appeal.

risks.' [Citation.]" (*Montrose, supra*, 10 Cal.4th at pp. 663-664, italics omitted.)

Normally, in the third party context, "[i]t is the damaged or injured third party who initiates the action against the insured. If coverage is ultimately established, it is the insurer that in turn must indemnify the insured for 'all sums which the insured shall become legally obligated to pay.' " (*Montrose, supra*, 10 Cal.4th at p. 665.) In the usual situation, Housing as the insured would have been sued by tenants at the project or HUD (or the Commission might have been sued by the Authority), and would then have tendered its defense to IIC, seeking coverage and a defense. Here, however, no such related actions were filed, although tenants made telephone complaints to Housing which then fixed the problems reported at the site. Housing eventually sought and obtained its default judgment against JBR for construction defects. This action followed.

The basic coverage part of this liability policy provides:

"COVERAGE B - PROPERTY DAMAGE LIABILITY

"The Company will pay on behalf of the insured all sums *which the insured shall become legally obligated to pay as damages* because of

". . . . . . . . . . . . . . . . . . . . . . . .

"Coverage B - *property damage*

"*to which this insurance applies, caused by an occurrence*, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements."[9] (Italics added.)

Thus, under this coverage part, the question as to breach of contract/bad faith is whether Housing as the insured was "*legally obligated to*

[9]As defined by the policy, " 'occurrence' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

*pay* [*sums*] *as damages* because of . . . *property damage to which this insurance applies, caused by an occurrence,"* and whether IIC breached its contractual/covenantal duties by not providing indemnification as requested.

## B

### *Duty to Defend or Indemnify*

█ As explained in *Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 878 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*), standard liability policies require an insurer to defend a "suit," but give it discretion to investigate and settle a "claim."[10] In *Foster-Gardner,* the Supreme Court explored the concept of what is a "suit" that is required to trigger an insurer's duty to defend under a CGL liability policy, holding a precomplaint administrative order that the insured take remedial action to clean up pollution is not a "suit" triggering such a duty to defend. There the court stated the rule that "a 'suit' is a court proceeding initiated by the filing of a complaint" (*id.* at p. 888) for purposes of analyzing a duty to defend. The court stated a preference for a " 'bright-line rule that, by clearly delineating the scope of risk, reduces the need for future litigation. Indeed, it is the position taken by [. . . other jurisdictions] that will open the flood gates of litigation by inviting, and requiring, a case-by-case determination whether each new and different letter presenting the claim of an administrative agency is to be deemed the "functional equivalent of a suit brought in a court of law." ' [Citation.]" (*Ibid.,* italics omitted.)

In *Foster-Gardner,* the Supreme Court contrasted the policy term "suit" to the policy term "claim" (also called a precomplaint notice at 18 Cal.4th at page 879), relying on the Court of Appeal opinion in *Fireman's Fund Ins. Co.* v. *Superior Court* (1997) 65 Cal.App.4th 1205, 1216 [78 Cal.Rptr.2d 418] (*Fireman's Fund*) (review granted Dec. 23, 1997 (S065447), ordered published Aug. 12, 1998, review dismissed as improvidently granted Oct. 14, 1998), as follows: " 'A "claim" can be any number of things, none of which rise to the formal level of a suit—it may be a demand for payment communicated in a letter, or a document filed to protect an injured party's right to sue a governmental entity, or the document used to initiate a wide variety of administrative proceedings. . . . While a claim may ultimately ripen into a suit, "claim" and "suit" are not synonymous.' " (*Foster-Gardner, supra,* 18 Cal.4th at p. 879.) The court then explained the status of that particular litigation: "Of course, because we conclude the insurers here did

---

[10]The policy does not define "suit" or "claim" for purposes of defining the insurer's defense and indemnification duties.

not contract and receive premiums to defend anything but a civil lawsuit, requiring them to defend the Order would result in an unintended windfall for Foster-Gardner. Moreover, it is indeed arguable that an insured's early intervention in a dispute outside the civil action context may reduce any indemnity for which the insurer is ultimately held liable. That does not alter the scope of the insurer's duty to defend. Thus, even if Foster-Gardner is correct that its insurers will ultimately be obligated to indemnify costs incurred as a result of the Order, this merely means that the insurers have an inherent incentive to participate in those proceedings where the costs are ascertained. Under the language of the policy, however, this is a judgment call left solely to the insurer ('the company . . . may make such investigation and settlement of any claim . . . as it deems expedient'). [Citations.] In any event, as the Court of Appeal in *Fireman's Fund*[, *supra,* 65 Cal.App.4th at p. 1212, fn. 6] pointed out, 'this anomaly is more imagined than real since insurance companies routinely pay "claims" that have not ripened into "suits" and which therefore have not triggered a defense obligation.'" (*Foster-Gardner, supra,* 18 Cal.4th at pp. 883-884, italics omitted.)

Interpreting a prior case, *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 814 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*), the Supreme Court in *Foster-Gardner* also outlined the policy coverage rules for environmental cleanup costs as follows: "The insurance policies at issue provided coverage to [insured] for all sums [insured] became legally obligated to pay as 'damages' (under two policy forms) or 'ultimate net loss' (under a third) because of property damage. [Citation.] We determined whether (i) any adverse orders issued in those suits would 'legally obligate' [insured] to pay such costs, (ii) the costs would constitute 'damages' or 'ultimate net loss,' and (iii) such costs would be incurred because of 'property damage.' [Citation.] We noted that '[o]nly if all three conditions [were] fulfilled [would] the insurers' duty to provide coverage arise under the policies.' [Citation.]" (*Foster-Gardner, supra,* 18 Cal.4th at p. 875.)

In *Foster-Gardner,* the court discussed duty to defend issues as follows: "Moreover, the proceedings in *AIU* in which 'damages' were sought were civil actions, not administrative proceedings. [Citation.] We did not hold that an insurer has a duty to defend when no such suit has been filed. As *Fireman's Fund* observed, '*AIU*'s holding—that there is coverage for certain damages sought in a third party suit prosecuted by the [United States Environmental Protection Agency] under [the Comprehensive Environmental Response, Compensation and Liability Act]—has nothing to do with whether the carrier has a duty to defend when no third party suit has been filed.' [Citation.]" (*Foster-Gardner, supra,* 18 Cal.4th at pp. 885-886, italics omitted.)

In the case before us, before any actions were filed against it, Housing paid repair expenses and then sought liability coverage for them. Although in general, " 'insurance companies routinely pay "claims" that have not ripened into "suits" and which therefore have not triggered a defense obligation' " (*Foster-Gardner, supra*, 18 Cal.4th at p. 884), here, Housing did not present any tenant claims to IIC, and filed the underlying JBR action and obtained the default judgment instead, for which it sought indemnification. The problem is, where was the Housing liability for damages to the tenants or HUD, and was it ever formalized by means of a claim or suit? Also, did anyone sustain damages caused by an occurrence of property damage within the policy?

In light of all this authority, although the issues presented here are not clearly defined by the parties, we may restate them as follows. First, we are not dealing directly with a duty to defend issue, such as was presented in *Foster-Gardner*, since Housing is not claiming a defense from IIC. Rather, Housing is seeking to defend on appeal the verdict for breach of contract damages for IIC's failure to indemnify it for the JBR default judgment, on the theory that the tenants' complaints to Housing constituted either claims against the policy, or led to damages that Housing incurred, because Housing had a statutory and contractual duty to repair the property. (See fn. 3, *ante*.) Housing claims its duties to repair the property were owed not only to the tenants, but also to HUD, and by the Commission to the Authority, so that if these duties were breached, it would be liable, and hence it had to proceed against the IIC policy to protect itself. This, it argues, constitutes a sufficient "claim" against it, producing "damages," such that liability coverage was proper, under the test stated in *AIU, supra*, 51 Cal.3d 807: Housing, as the insured, (1) became legally obligated to pay such repair costs, due to potential adverse orders which could have been issued in any suits filed by the tenants, HUD, or the Authority against the Commission, (2) the repair costs would constitute "damages," and (3) such costs would be incurred because of "property damage" within the policy definitions. (*Id.* at p. 814.)

Further, Housing sought and obtained damages for bad faith conduct by IIC in the investigation and processing of claims against the policy: Housing's claim for indemnification for the property damage at the site or the JBR default judgment amount. According to Housing, this is only a simple question on appeal of whether there is substantial evidence to support the judgment. (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925].) We disagree. "When the interpretation of an insurance policy does not involve the credibility of extrinsic evidence—and that is the case here—an appellate court can independently determine the policy's meaning. [Citation.]" (*National Union Fire Ins. Co.* v. *Lynette C.* (1994)

27 Cal.App.4th 1434, 1457 [33 Cal.Rptr.2d 496].) Our task is to analyze the standard coverage provision at issue here to determine if there is a sound basis for the damages awards made on these theories.

## C

### *Breach of Contract Damages*

To determine if Housing, as the insured, can claim liability coverage under the IIC policy for repair costs for problems at the site, we must apply the three-part test stated in *AIU, supra,* 51 Cal.3d 807. Since Housing sought coverage in 1992 based on the tenant complaints of alleged property damage at the site, and again in 1994 based on the default judgment obtained against JBR, we should consider both possibilities of coverage.

First, did Housing become legally obligated to pay these repair costs, due to potential adverse orders which could have been issued in any suits filed by the tenants, HUD, or the Authority against the Commission? (*AIU, supra,* 51 Cal.3d at p. 814.) The answer is clearly no, because neither the tenants nor HUD sued Housing, nor did the Authority sue its sister agency the Commission for failure to make needed repairs. Here, while Housing incurred expenses to repair the property, the statutory and contractual duties on which it relies are not enough to implicate this liability policy, even if they constitute separately owed public obligations. Those duties do not of their own force create insurance coverage. They did not create "damages" paid out by Housing, such as the second part of the test for coverage would require. (*AIU, supra,* 51 Cal.3d at p. 814.)

Moreover, the distinction made in *Foster-Gardner* between a claim and a suit is instructive here, even though this is not (as was *Foster-Gardner*) a duty to defend case. (*Foster-Gardner, supra,* 18 Cal.4th at pp. 888-889.) There was never any claim against the liability policy here insofar as Housing's status as an additional insured is concerned. Nor were any "suits" filed by third parties. The trial court's concern with public policy, as supporting a rule that no underlying claim or suit need be filed in order for liability coverage to exist, is an important one, but is not dispositive of policy language interpretation for purposes of determining breach of contract liability. A discretionary ability on the part of an insurer to " 'make such investigation and settlement of any claim . . . as it deems expedient' " (*id.* at p. 883) is not the same as a contractual duty of the insurer to respond to an insured's request for coverage that is based on an actual third party claim against it.

We do not think the analysis is different if one considers the default judgment against JBR to be the asserted claim against the policy, or other

basis for coverage, as opposed to the tenant requests to Housing for repairs. The default judgment shows that Housing proved up damages for construction defects at the project that were created by JBR and its subcontractors. Are these necessarily "damages" that Housing, as the insured, is "legally obligated to pay" to a third party? (*AIU, supra*, 51 Cal.3d at p. 814.) No, the default judgment represents compensation that Housing, as the property owner, is owed by the contractors; it does not represent damages that Housing is liable to pay to a third party injured by Housing's negligence. Housing cannot persuasively argue that IIC owed it a contractual duty to indemnify it for any such damages payable to a third party claimant.

Finally, such repair costs would have to have been incurred because of "property damage" within the policy definitions in order for coverage to be afforded. We discuss this concept further in part II [nonpub.]; for now it is enough to say that Housing has not established a right to coverage under the liability policy for its repair costs, on a breach of contract theory.

### D

#### *Bad Faith Damages*

■ Housing's damages award is similarly defective to the extent it represents compensation for bad faith conduct by IIC in the investigation and processing of a claim against the policy. Bad faith claims are based on the contractual covenant of good faith and fair dealing. (*Waller* v. *Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at pp. 35-36.) Where a breach of contract cannot be shown, there is no basis for a finding of breach of the covenant. (*Ibid.*) Here, Housing alleged in its second amended complaint that IIC failed to respond promptly to its claims under the policy (i.e., in 1992, for alleged property damage and later, for indemnification of the 1994 JBR default judgment). However, we have determined above that Housing could not seek breach of contract damages as an additional insured, as it did not meet the requirements for such an action. The portions of the judgment based on bad faith theories (i.e., the *Brandt* v. *Superior Court, supra*, 37 Cal.3d 813, attorney fees as damages in the amount of $125,500 and expert fees as damages in the amount of $81,496.20) are accordingly without support, as is the entire special verdict on these contract-based theories. (See Appen. A, at p. 555.)

■ Finally, because the breach of contract/bad faith theories were tried together with the section 11580, subdivision (b)(2) claim, and the same evidence was presented on both fronts, we must consider whether IIC's defense on the statutory claim was unfairly prejudiced. The trial court

acknowledged at the outset of trial that if there were no viable breach of contract claim, then the evidence of bad faith claims-handling practices would not be appropriately presented. Under Code of Civil Procedure section 475, error is grounds for reversal where there was substantial injury from the error and a different result would have been probable absent the error. (Accord, Evid. Code, §§ 353, 354.) Appellants have the burden of showing such prejudicial error. (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163].)

Here, Housing presented extensive evidence designed to show IIC's claims representatives and executives were either knaves or fools in the matter of claims investigation, claims processing policy analysis, and communications with Housing and its counsel. Specifically, IIC waited 832 days before providing Housing with an accurate copy of the policy, requested consent to provide the policy when consent was already in the file, misrepresented the terms of the policy, the cancellation date, and the coverage limits, and did not follow its own claims manuals and procedures. After Housing's June 1992 request for policy benefits for property damage, IIC made a preliminary response in April 1993. In August 1993, IIC promised Housing a prompt response, but then IIC's claims agent Blake retired in February 1994 and closed the file. Denial of coverage came in June 1994. IIC's director of claims, Robert Lewis, was apprised in 1994 of Blake's and Jenny's actions in processing the claim and did nothing to change them.

All of this evidence was a diligent and pervasive effort by Housing to expose the jury to evidence of alleged insurer misconduct, even though the actual issues in the case should have been limited to the coverage determination under section 11580, subdivision (b)(2). Without an adequate basis for Housing to claim breach of contract in its capacity as an additional insured (as opposed to a judgment creditor under section 11580, subdivision (b)(2)), there was no basis for the bad faith cause of action and none of this claims processing and investigation evidence should have been presented to the jury. It is the prejudicial and pervasive nature of the bad faith evidence that forces us to conclude that the error in allowing this theory to be presented to the jury also infected the determination of the section 11580, subdivision (b)(2) claim. We may infer such prejudice from the very similar results and dollar figures the jury reached in the two special verdicts, after it considered all the evidence together. (See Appen. A.) It must have found IIC equally responsible on both theories, based on the combined showing. Moreover, the efforts of the trial court and counsel to present the two approaches as "apples and oranges" were simply insufficient to prevent such prejudice. Accordingly, the entire judgment must be reversed, although as we next explain, the statutory cause of action is subject to retrial.

## II

### *Section 11580, Subdivision (b)(2) Action**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Reversed with directions to enter judgment for IIC on the breach of contract and bad faith theories, and to conduct appropriate further proceedings on the remaining cause of action (§ 11580, subd. (b)(2)) and related requests for relief, in accordance with the views expressed in this opinion. Each party to bear its own costs.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied January 6, 1999, and on December 23, 1998, the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied February 24, 1999.

*See footnote 1, *ante*, page 526.

APPENDIX A

F I L E D
KENNETH E. MARTONE
Clerk of the Superior Court
MAY 24 1996
By: M. MASES Deputy

MICROFILM CC P668.5
REEL # 2528 474

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| SAN DIEGO HOUSING COMMISSION, a public agency; and HOUSING AUTHORITY OF THE CITY OF SAN DIEGO, a public agency, <br><br> Plaintiff, <br><br> vs. <br><br> INDUSTRIAL INDEMNITY COMPANY OF THE NORTHWEST, a Washington corporation; INDUSTRIAL INDEMNITY, an unknown entity; CRUM & FORSTER CORPORATION, a New Jersey corporation; CRUM & FORSTER MANAGEMENT ACCOUNTS, an unknown entity; and Does 1 through 10, inclusive, <br><br> Defendants. | Case No.: 680684 <br><br> JUDGMENT ON SPECIAL VERDICT FOR PLAINTIFFS, SAN DIEGO HOUSING COMMISSION and HOUSING AUTHORITY OF THE CITY OF SAN DIEGO AGAINST DEFENDANT, INDUSTRIAL INDEMNITY COMPANY |

This action came on regularly for trial by jury on January 9, 1996, with Plaintiffs, SAN DIEGO HOUSING COMMISSION and HOUSING AUTHORITY OF THE CITY OF SAN DIEGO appearing in person and by Charles B. Christensen and Edward C. Meara of Detisch & Christensen, their attorneys, and Defendant, INDUSTRIAL INDEMNITY COMPANY, a corporation, appearing in person and by Thomas W. Byron and Lisa Shemonsky of Edwards, White & Sooy, their attorneys; a

Appendix A

jury of twelve (12) persons was duly impaneled and sworn; witnesses testified; and after being duly instructed by the Court, the Jury deliberated and thereon rendered the following special verdicts:

### SPECIAL VERDICT FORM NO. 1

We, the Jury in the above-entitled action, find the following special verdict on the questions submitted to us concerning Plaintiffs' Insurance Code Section 11580(b)(2) cause of action:

**Question No. 1.:** Was there any occurrence of property damage at the Calle Primera Project during the term of the Industrial Indemnity policy period for John B. Reed Construction Company?

| | Jury Poll | Yes | No |
|---|---|---|---|
| Answer "yes" or "no": | 12-0 | X | ___ |

If you answer Question No. 1 "no", sign and return this verdict.

If you answer Question No. 1 "yes", then answer Question No. 2.

**Question No. 2.:** With respect to the alleged construction defects at the Project, did any of the defects involve "property damage" as defined in the policy? The Jury should answer each listed item separately.

| Answer "yes" or "no": | Jury Poll | Yes | No |
|---|---|---|---|
| Stucco problems | 9-3 | ___ | X |
| Drainage problems | 12-0 | X | ___ |
| Plumbing problems | 12-0 | X | ___ |
| Floor problems | 12-0 | X | ___ |
| Weep screed | 12-0 | ___ | X |
| Exterior lights | 9-3 | X | ___ |

Cabinets 12-0 _____ __X__

Relocation Costs 12-0 __X__ _____

If you answer Question No. 2 "yes" as to any of them, then answer Question No. 3.

**Question 3.:** With respect to each project defect for which you answered "yes" in Question No. 2, state the dollar amount of property damage, if any, for each such defect which you find is covered by the Industrial Indemnity policy and included in the Default Judgement.

 Jury Poll

Stucco problems 12-0 $_____-0-_____

Drainage problems 12-0 $___58,094.00___

Plumbing problems 9-3 $__290,867.00___

Floor problems 12-0 $__280,750.00___

Weep screed 12-0 $_____-0-_____

Exterior lights 10-2 $___3,826.00____

Cabinets 12-0 $_____-0-_____

Relocation Costs 12-0 $__322,000.00___

 Total Property Damage $_(DO NOT ADD)_

If you filled in any damages with response to Question No. 3, please go to Question No. 4.

**Question No. 4.:** Did John B. Reed Construction cooperate with Industrial Indemnity?

 Jury Poll Yes No

Answer "yes" or "no": 12-0 __X__ _____

If you answer Question No. 4 "no", sign and return this verdict.

/ / /

If you answer Question No. 4 "yes", then answer Question No. 5.

**Question No. 5.:** State the dollar amount of damages owed by Industrial Indemnity for the default judgment against John B. Reed Construction Company for which there is coverage under the policy, in addition to those amounts set forth in answer to Question No. 3.

<u>Jury Poll</u>

| | | |
|---|---|---|
| Attorney's Fees in the<br>Prior Action | 12-0 | $ 92,129.55 |
| Costs in the Prior Action | 12-0 | $ 17,913.19 |
| Expert Witness Fees in<br>the Prior Action | 12-0 | $ 92,984.00 |

**Question No. 6.:** Did any of the exclusions in Industrial Indemnity Company's policy preclude coverage for Reed Construction Company with respect to damages claimed by Plaintiffs in their lawsuit against Reed, San Diego Superior Court Case No. 631235?

| | <u>Jury Poll</u> | Yes | No |
|---|---|---|---|
| Answer "yes" or "no": | 12-0 | _____ | _X_ |

Dated: February 22, 1996 _____Dennis A. Walsh_____
 Presiding Juror

\* \* \* \* \* \*

SPECIAL VERDICT FORM NO. 2

**Question No. 1.:** Was there insurance coverage for the Plaintiffs, San Diego Housing Commission or Housing Authority of the City of San Diego under the Comprehensive General Liability policy for the claims made or presented arising out of construction defects at the Calle Primera Project?

/ / /

/ / /

| | Jury Poll | Yes | No |
|---|---|---|---|
| Answer "yes" or "no": | 12-0 | X | |

If you answer Question No. 1 "no", sign and return this verdict.

If you answer Question No. 1 "yes", then answer Question No. 2.

**Question No. 2.:** Were there claims presented by Plaintiffs, San Diego Housing Commission or Housing Authority of the City of San Diego to Industrial Indemnity Company that give rise to coverage under the policy?

| | Jury Poll | Yes | No |
|---|---|---|---|
| Answer "yes" or "no": | 12-0 | X | |

If you answer Question No. 2 "no", sign and return this verdict.

If you answer Question No. 2 "yes", then answer Question No. 3.

**Question No. 3.:** Did Industrial Indemnity breach its coverage obligations to the San Diego Housing Commission or Housing Authority under the terms of the insurance policy?

| | Jury Poll | Yes | No |
|---|---|---|---|
| Answer "yes" or "no" | 12-0 | X | |

If you answer Question No. 3 "no", sign and return this verdict.

If you answer Question No. 3 "yes", then answer Question No. 4.

**Question No. 4.:** With respect to the San Diego Housing Commission or the Housing Authority of the City of San Diego,

/ / /

please state the amount of property damage occurring under the Industrial Indemnity CGL policy, if any, as set forth below:

Jury Poll

| | Jury Poll | |
|---|---|---|
| Stucco problems | 12-0 | $ -0- |
| Drainage problems | 12-0 | $ 58,094.00 |
| Plumbing problems | 10-2 | $ 145,434.00 |
| Floor problems | 12-0 | $ 280,750.00 |
| Weep screed | 12-0 | $ -0- |
| Exterior lights | 12-0 | $ 3,826.00 |
| Cabinets | 12-0 | $ -0- |
| Relocation Costs | 12-0 | $ 322,000.00 |
| Total Property Damage | | $ (Do not add) |
| Attorneys' Fees in the Prior Action | 12-0 | $ 92,129.55 |
| Costs of Suit in the Prior Action | 12-0 | $ 17,913.19 |
| Expert Fees in the Prior Action | 12-0 | $ :,984.18 |

If you filled in any damages with response to Question No. 4, please go to Question No. 5. If you filled in no damage, please sign and return the verdict.

**Question No. 5.**: Did Industrial Indemnity breach the implied covenant of good faith and fair dealing?

Answer "yes" or "no":

| | | Jury Poll | Yes | No |
|---|---|---|---|---|
| (a) | As to San Diego Housing Commission | 12-0 | X | |
| (b) | As to the Housing Authority | 12-0 | X | |

/ ./ /

If you answer Question No. 5 "no", as to both plaintiffs, then sign and return this verdict.

If you answer Question No. 5 "yes", as to either plaintiff or both of them, then answer Question No. 6.

**Question No. 6.:** Do you find that any plaintiff to whom you answered "yes" in response to Question No. 5 acted in bad faith with respect to the manner in which it made, or maintained, its claim to Industrial Indemnity Company?

Answer "yes" or "no" after the name of each applicable plaintiff:

| | Jury Poll | Yes | No |
|---|---|---|---|
| Plaintiff, San Diego Housing Commission | 12-0 | ____ | __X__ |
| Plaintiff, San Diego Housing Authority | 12-0 | ____ | __X__ |

If you answer Question No. 6 "no" as to both plaintiffs, then sign and return this verdict.

If you answer Question No. 6 "yes", as to either plaintiff, then answer Question No. 7.

**Question No. 7.:** Assuming that 100 percent represents the total causes of the plaintiff's, or plaintiffs', if applicable, damage, what percentage of this 100 percent is attributable to the bad faith conduct of plaintiff(s) and what percentage of this 100 percent is attributable to the bad faith conduct of defendant Industrial Indemnity Company?

Answer:

To: Plaintiff, San Diego Housing Commission _____%

To: Plaintiff, San Diego Housing Authority _____%

/ / /

554

To: Defendant, Industrial Indemnity Company _____%

\_\_100\_\_%

Please sign and return the verdict form.

Dated: February 22, 1996 _Dennis A. Walsh_
 Presiding Juror

* * * * * *

It appearing that by reason of those special verdicts, Plaintiffs are entitled to judgment against Defendant for damages; for interest; for attorneys' fees; and for costs;

NOW, THEREFORE, IT IS ADJUDGED, ORDERED AND DECREED that Plaintiffs, SAN DIEGO HOUSING COMMISSION and HOUSING AUTHORITY OF THE CITY OF SAN DIEGO recover from Defendant, INDUSTRIAL INDEMNITY COMPANY, as follows:

1. Damages in the aggregate amount of One Million Thirty Three Thousand Two Hundred Forty One Dollars and Fifty Eight Cents ($1,033,241.58), plus costs as set forth in Paragraph 2 hereof, as follows:

 a. Covered property damage in the amount of Four Hundred Thousand Dollars ($400,000.00):

 "This Court does not find coverage under the first of the three subparagraphs defining covered activities. There was no damage claimed by Plaintiffs relating to John B. Reed Construction's premises or 'operation', further, the policy precludes coverage under both subparagraphs (1) and (2). The Court agrees that coverage applies for two calendar years under the facts and the policy."

 b. Attorneys' fees in the amount of Ninety Two Thousand One Hundred Twenty Nine Dollars and 59 Cents ($92,129.59), costs in the amount of Seventeen Thousand Nine Hundred Thirteen Dollars and 19 Cents ($17,913.19) and expert witness fees in the amount of Ninety Two Thousand Nine Hundred Eighty Four Dollars and No Cents ($92,984.00), adjudged in the case of _San Diego Housing Commission/Housing Authority of the City of San Diego v. John B. Reed Construction, Inc.,_ Case No. 651235, for a total in the amount of Two Hundred Three Thousand Sixty-Two Dollars and 74 cents ($203,062.74);

c. Interest in the amount of ten percent (10%) per annum on One Million One Hundred Fifty Thousand Six Hundred Three Dollars and 92 cents ($1,150,603.92), from March 15, 1994 to date of the verdict, February 22, 1996, in the amount of Two Hundred Twenty Three Thousand One Hundred Eighty Two Dollars and 64 cents ($223,182.64);

d. Attorneys' fees as Brandt damages in the amount of One Hundred Twenty Five Thousand Five Hundred Dollars ($125,500.00);

e. Expert fees as Brandt damages in the amount of Eighty One Thousand Four Hundred Ninety Six Dollars and Twenty Cents ($81,496.20), as set by the Court in motion:

"The Court grants items d and e in accordance with Brandt v. Superior Court (1985) 37 Cal.3d 813. Plaintiffs prevailed on the bad faith issues herein. (See, Special Verdict Form No. 2, Question 5.) The fact the Insurance Code Section 11580(b) judgment was larger does not effect the reasoning of the Brandt court"; and

f. For interest on the post-verdict award from February 22, 1996, to date of payment at the rate of ten percent (10%) per annum until paid.

2. Plaintiffs' costs of suit in the amount of $_____.

DATED: May 24, 1996

_____
JUDGE OF THE SUPERIOR COURT
ANTHONY C. JOSEPH

APPROVED AS TO FORM:

EDWARDS, WHITE & SOOY

By: _____
Thomas W. Byron, Esq.
Attorneys for Defendant,
INDUSTRIAL INDEMNITY
COMPANY

/Primera/II/pleadings/Judgment.2