Filed 6/18/26  Gobind Enterprises v. Certain Underwriters at Lloyd's London CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GOBIND ENTERPRISES INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CERTAIN UNDERWRITERS AT LLOYD'S LONDON et al. <br><br> Defendants and Respondents. | F089149 <br><br> (Super. Ct. No. CV-20-004260) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Sonny S. Sandhu, Judge.

Sodhi Law Group, Jakrun S. Sodhi, and Ameet S. Birring for Plaintiff and Appellant.

Vanderford & Ruiz, LLP, Ty S. Vanderford, and Chanh Than for Defendants and Respondents.

-ooOoo-

A trucking company purchased a used semitruck at auction for approximately $23,000. It then obtained a $40,000 insurance policy with comprehensive coverage. The truck's engine was subsequently damaged, allegedly by an act of vandalism, and the company's insurance broker submitted a claim to the insurer on its behalf.

The insurer investigated and concluded that the engine needed to be replaced. The cost of replacement with a used/refurbished engine was determined to be approximately $16,000, which was the amount offered in full settlement of the claim (minus the deductible). The trucking company did not want a used engine. Its sole owner and operator had spoken to a mechanic and was told that a new engine could be purchased and installed for around $36,000. Despite having never reviewed the terms of the policy, he apparently believed that demanding a new engine was reasonable since the cost was below the $40,000 policy limit.

The insurance policy had an appraisal clause that provided for a binding determination of the amount of loss by neutral arbitrators. Either party could have invoked this provision. Since the insured had not bothered to read the policy, it may have been ignorant of the appraisal procedure. The insurer, having already investigated the amount of loss, saw no reason to invoke the provision itself.

The insurer made a second attempt to resolve the claim for the repair estimate of $16,000. The trucking company did not respond. About five months later, the insurer received a letter from an attorney threatening litigation unless it paid $100,000 to cover the engine costs and other alleged losses. The insurer retained its own legal counsel. But even then, neither side enforced the appraisal clause.

The insurer's lawyers exercised certain investigatory rights under the terms of the policy. This included a demand for documents and the scheduling of a deposition-like procedure known as an examination under oath (EUO). The owner of the trucking company failed to appear for the EUO. He did appear for a rescheduled EUO, and gave testimony, but failed to produce all requested documents.

The EUO concluded with a stipulation regarding document production and the option of "proceed[ing] with an appraisal" if the parties could not reach a settlement. The trucking company, however, failed to meet an extended deadline for the production of documents and stopped communicating altogether. After a month of silence and inactivity, the insurer issued a denial of the claim.

The insurer's position, as asserted by its legal counsel, was that the trucking company breached its obligations under the policy to cooperate in the investigation of the claim. The policy also required, as a condition precedent to any payment of loss, a "signed and sworn" proof of loss statement. The insurer offered to reconsider its denial of the claim if the requested documents were produced within two weeks, but the deadline passed without any response.

Nearly two years later, the trucking company sued the insurer and a third party administrator who had handled the claim on the insurer's behalf. The complaint alleged a breach of contract by failure to pay a covered claim, and two theories of bad faith: (1) failure to investigate the claim and (2) unreasonably withholding benefits under the policy. Punitive damages were alleged in connection with the causes of action for bad faith.

Prior to answering the complaint, the insurer successfully petitioned to invoke and enforce the appraisal clause. The amount of loss was determined to be $20,000. The insurer promptly issued a check to the trucking company and both defendants later moved for summary judgment, which was granted. The trucking company now challenges the summary judgment ruling. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**Parties**

Plaintiff below and appellant herein, Gobind Enterprises Inc. (plaintiff), is a reportedly dissolved corporation that was wholly owned and controlled by an individual named Pritpal Singh. Singh attempted to name himself as a separate plaintiff but was

dismissed from the case on demurrer for lack of contractual privity. Some of plaintiff's underlying conduct will be summarized by reference to Singh's actions.

Defendants below and respondents herein are Certain Underwriters at Lloyd's, London (Lloyd's) and Affirmative Risk Management Corporation (ARM). ARM is a third party administrator that acted on Lloyd's behalf during part of the relevant time period. Lloyd's and ARM are collectively referred to as defendants.

**Factual History**

In August 2016, plaintiff bought a 2012 International truck tractor at auction for $23,256.24, inclusive of $2,256.24 in taxes and fees. The mileage on the engine was approximately 330,000. According to plaintiff, as stated in testimony by Singh, the engines used in truck tractors can last for 1,000,000 miles.

Plaintiff obtained insurance for the vehicle through a broker. The policy, issued by Lloyd's, provided comprehensive coverage up to the amount of $40,000. The policy specified a deductible of $1,000 per claim except for "fire, theft, upset, overturn, rollover or jack knife," which required a $2,500 deductible.

The terms of the policy limited any recovery for property damage to the $40,000 policy limit "or the actual cash value of the vehicle concerned at the time of loss, whichever [was] less." In the event of "partial loss or damage," Lloyd's would be liable "only for the actual cost of (and [would] have the option of) repairing, rebuilding or, if necessary, replacing the parts damaged and destroyed." These restrictions were restated in a section labeled "Actual Cash Value," which explained that if the vehicle was worth less than the $40,000 policy limit, plaintiff would "only be entitled to recover … such proportion of the said loss or damage as the limits of liability bear to the full actual cash value." (Boldface, underscoring, and some capitalization omitted.)

Additional terms and conditions relevant to this litigation were set forth under the headings, "Inspection of Loss or Damage," "Proof of Loss," "Payment of Loss," and

4.

"Appraisal." (Some capitalization omitted.) The language of those provisions was as follows:

> "INSPECTION OF LOSS OR DAMAGE. In the event of any loss or damage covered hereunder, the [insured party] shall give [Lloyd's] a reasonable time and opportunity to examine the Insured Automobile before any repairs are begun or any physical evidence of damage removed."

> "PROOF OF LOSS. Within sixty (60) days after loss or damage, unless such time is extended in writing by [Lloyd's], the [insured party] shall forward to [Lloyd's] a statement, signed and sworn to by the [insured party], stating the place, time and cause of the loss or damage, the interest of the [insured party] and of all others in the property, the sound value thereof and the amount of loss or damage thereto, all encumbrances thereon and all other insurance, whether valid and collectable or not, covering said property. The [insured party], as often as required, shall submit to examination under oath by any person designated by [Lloyd's] and subscribe the same. As often as required, the [insured party] shall produce for examination all books of accounts, bills, invoices, and other vouchers, or certified copies thereof if the originals are lost, at such reasonable place as may be designated by [Lloyd's], and shall permit extracts and copies thereof to be made."

> "PAYMENT OF LOSS. The loss shall in no event become payable, until sixty (60) days after the verified proof of loss herein required shall have been received by [Lloyd's] and, if appraisal is demanded, then not until sixty (60) days after an award has been made by the appraisers."

> "APPRAISAL. In case the [insured party] and [Lloyd's] shall fail to agree as to the amount of loss or damage each shall on the written demand of either, select a competent and disinterested appraiser. Before entering upon the reference, the appraisers shall first select a competent and disinterested umpire, and failing for fifteen (15) days to agree upon such umpire, then on the request of the [insured party] or [Lloyd's] such umpire shall be selected by a judge of a court of record in the County and State in which the appraisal is pending. The appraisers shall then appraise the loss or damage, stating separately the sound value and loss or damage; and failing to agree, shall submit their differences only to the umpire. The award in writing of any two, when filed with [Lloyd's], shall determine the amount of sound value and loss or damage.…"

5.

On July 27, 2017, plaintiff's insurance broker tendered a claim to Lloyd's on plaintiff's behalf. The written notice correctly stated plaintiff's name and contact information but erroneously identified the insured vehicle. The broker not only gave the wrong make of the truck, but also a completely different vehicle identification number (VIN). The loss was said to have occurred two weeks earlier, on July 14, 2017. The notice also contained these statements: "Insured indicated engine/fuel was contaminated with unknown substance. Insured unknown where or when this was done."

Lloyd's evidently determined the correct vehicle for which plaintiff was claiming a loss. The claim was handled by ARM on Lloyd's behalf, and specifically by an insurance adjuster named Danner Rogers. Rogers was located in Arkansas, and he relied on a "local adjuster" in California named Mike Kaney to conduct part of the investigation.[1]

On August 2, 2017, ARM sent a letter to plaintiff explaining that it was acting on behalf of Lloyd's. In subsequent correspondence, ARM repeatedly specified it was acting "as their third party administrator." The August letter acknowledged plaintiff's claim and requested supporting documentation.

Although plaintiff was based in Turlock, it insisted on having the vehicle inspected and repaired by a mechanic in Sacramento. The mechanic examined the engine and found it was contaminated with sand or a similar foreign substance. Plaintiff purported to suspect the contamination was an act of vandalism committed by a disgruntled former business partner of Singh.

The mechanic concluded the engine was irreparably damaged and needed to be replaced. He prepared a written estimate for the cost of replacing it with a "new engine

_____

[1] Defendants' motion papers alternatively refer to Kaney as an "independent expert." The record shows he worked for a company called Schifrin, Gagnon & Dickey, Inc. (SGD). It appears ARM contracted with SGD to inspect plaintiff's vehicle and estimate the amount of damage/loss. SGD and Kaney are not parties to this lawsuit.

from [the] manufact[urer]." (Capitalization omitted.) The quoted price of $35,778.09 included pre-tax charges of $27,500 for the engine, $5,200 for installation (52 hours of labor at $100 per hour), and $878.74 for oil, coolant, and miscellaneous parts.[2]

On or about August 16, 2017, Kaney contacted plaintiff to arrange an inspection of the vehicle at the repair shop of the mechanic in Sacramento. The inspection required a "tear down" of the engine, i.e., disassembly and removal of multiple components, and ARM wanted photographic evidence of the nature and extent of the claimed damage. According to a sworn declaration by Kaney, he attempted to inspect the engine on August 17, 2017, but either the mechanic or someone else at the repair shop "had already reassembled the engine."

Over the next three months, Kaney made several additional, unsuccessful attempts to inspect the engine. It is generally undisputed that plaintiff's chosen mechanic and/or the repair shop were at least partially responsible for the delay. There is a dispute regarding whether and to what extent plaintiff's own actions caused or contributed to the delay. However, there is no evidence that defendants or Kaney bore any such responsibility.

Kaney eventually inspected the engine on November 17, 2017. He agreed the engine needed to be replaced. Kaney estimated the damage/loss based on the cost of replacing the damaged engine with a used/salvaged/refurbished engine. His total estimate of $16,198.90 included pretax charges of $12,500 for the replacement engine, $1,629 for installation (18.1 hours of labor at $90 per hour), and $1,066 in various

[2] A copy of the written estimate, which is dated "08/14/2017," was filed with the trial court in support of plaintiff's opposition to the motion for summary judgment. However, there is no evidence of when plaintiff first provided this document to defendants. Correspondence between Singh and ARM in October 2017 only shows defendants knew of the mechanic's determination that the engine needed to be replaced. In a December 2017 email, Singh alleged that his mechanic provided ARM with *two* estimates: one for the installation of a new engine and one for the installation of a used engine. The record does not contain any evidence of the latter.

additional costs. Accounting for taxes and plaintiff's $1,000 deductible, Kaney calculated a net loss of $15,198.90.

Kaney's documentation shows that the mileage on the vehicle at the time of inspection was 395,816. The appellate record elsewhere contains inconsistent statements (not made by Kaney) about the engine having "394,816 miles on it" or "391,816 miles." Regardless of those discrepancies, it appears undisputed the engine "had over 390,000 miles on it" at the time of loss, i.e., when plaintiff tendered its claim in July 2017.

On December 5, 2017, Kaney submitted a written report to ARM with the repair estimate. Two days later, ARM sent a letter to plaintiff enclosing Kaney's estimate. The letter, authored by Rogers, included the following statement: "Pending final approval from [Lloyd's], your settlement for the damages to the tractor on this claim will be $15,198.00." Rogers explained that he was using the repair estimate of $16,198 (rounded) and subtracting plaintiff's $1,000 deductible. According to a sworn declaration by Singh, plaintiff responded to this letter by "inform[ing] [d]efendants that [it] believed the estimate was too low."

On December 19, 2017, Rogers and Singh exchanged multiple e-mails. A message from Rogers attached a formal letter with enclosures of "claim documents for the undisputed amount of $13,698.90 in settlement of the loss to the 2012 International." The net settlement figure was lower than previously quoted in Rogers's letter of December 7, 2017, because it was calculated using a deductible of $2,500 instead of $1,000.

Singh responded with the following message: "Mr rogers you know already that how much it is going to cost with used and new engine the mechanic has given you both prices so now the thing is i reported my claim 0n july 14 2017 its been 5 moths passed away my company is totally shut down because of insurance company still not came to decide what you guys gonna do I have not paid any single penny yet so know i demand you guys to pay my total value for my truck if you dont wanna do then finally ill take this

matter in the court plus on the other hand im going to file a harasement report against your company that purposely you guys are delaying my claim by giving those unreasonable estimates which dosent make any sense[.]" (*Sic.*)

Rogers sent the following message the same day: "Mr. Singh, [¶] Your truck is a 2012 and does not warrant a 2017 engine. I have explained your policy being an Actual Cash Value previously, and will be happy to do so again. I have supplied the settlement documents for **<u>undisputed amount</u>** . [*Sic.*] Signing those documents, and returning them will not bar you from any future recovery. [¶] As it relates to delays, you are well aware the shop you chose did not comply with numerous requests for a complete tear down. I even offered to have this towed to an authorized dealer's shop for the proper tear down, which you refused."

The attachments to Rogers's emails included a proof of loss statement prepared by ARM for plaintiff to sign and have notarized. The document contained settlement and release language, including a waiver of all rights to which plaintiff might otherwise be entitled under Civil Code section 1542. Singh has declared he "did not feel comfortable signing the [Proof] of Loss," and subsequently "informed [d]efendants multiple times that [he] disagreed with the amount offered for coverage."

On January 17, 2018, ARM sent plaintiff a letter enclosing a check from Lloyd's in the amount of $13,698.90. It was the same amount offered one month earlier, calculated using a deductible of $2,500. The letter stated Lloyd's would waive the requirement of a signed proof of loss under the following conditions: "By accepting and negotiating this check, you agree with [Lloyd's] that this is the amount due for [the] damages to the 2012 International bearing VIN [ending in 8066] resulting from this claim just as if you had filed a formal Proof of Loss and you release [Lloyd's from liability] as if you had completed a formal Proof of Loss."

It is undisputed that plaintiff's claim did not meet the policy requirements for a $2,500 deductible. Rogers has attested that his failure to apply the correct deductible of

$1,000 was an honest mistake. Plaintiff maintains defendants' use of the wrong deductible to calculate the settlement offer was a contractual breach and evidence of bad faith.

Plaintiff did not cash the check and had no further direct communication with ARM after January 2018. In June 2018, a lawyer sent a demand letter to ARM on plaintiff's behalf. The letter reflected a mistaken belief that ARM was the actual insurer. Lloyd's was not mentioned anywhere in the correspondence.

The demand letter accused ARM of acting in bad faith by failing to "diligently" review and resolve plaintiff's claim. A reference was made to unspecified "supporting documentation [that] clearly demonstrated a total loss [in the amount of] $35,778.09." ARM's supposed wrongdoing allegedly resulted in plaintiff "having no source of income for five months, which thereafter led to the shutdown of [its] business." The letter demanded "$100,000 in satisfaction of the claim," in light of "all damages to the tractor, downtime income loss, and storage fees [charged by] the shop where the tractor [was] located." (Boldface and underscoring omitted.)

The letter also contained these statements: "Said demand shall remain open up to, and including, June 29, 2018 at 5:00 p.m. (PST), at which time it will be forever withdrawn. In that event, [plaintiff] hereby demands binding arbitration pursuant to the policy provisions. Also, please be advised that at the conclusion of any arbitration [plaintiff] will not execute a release of all claims."[3] (Boldface and underscoring omitted.)

---

[3] As far as the record and appellate briefing show, neither plaintiff nor defendants has ever mentioned this language in the June 2018 demand letter. The contingent demand for "binding arbitration pursuant to the policy provisions" could arguaby be viewed as an attempt to invoke the policy's appraisal clause. But since the issue was never raised, any such argument has been forfeited and will not be considered. (See *Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 73 [appellate courts may "ignore arguments, authority, and facts not presented and litigated in the trial court" and treat them as waived or forfeited].) It is further noted, however, that the appraisal clause requires additional

10.

On June 26, 2018, counsel for Lloyd's sent a letter to plaintiff's attorney acknowledging receipt of the demand made upon ARM. In pertinent part, the letter recited and invoked the policy's "Proof of Loss" provision. (Some capitalization omitted). A demand was made for plaintiff to submit to an EUO. Lloyd's further demanded the production of documents concerning ownership, registration, and maintenance of the vehicle; any repairs made to the vehicle at any time; all communications between plaintiff and the repair shop in Sacramento; all log books kept by plaintiff while operating the vehicle; and all written communications between plaintiff and Singh's former business partner (the individual accused/suspected of committing the alleged act of vandalism).

It was mutually agreed that the EUO and document production would take place on July 19, 2018. Singh was designated to sit for the EUO on plaintiff's behalf, but he failed to appear. The proceeding moved forward with Singh answering questions telephonically, but the parties eventually agreed to suspend the EUO and have Singh appear in person at a later date.

The next day, Lloyd's counsel wrote a stern letter to the opposing attorney regarding Singh's failure to appear. The letter recited the policy's proof of loss provision and asserted plaintiff was in breach of its obligations thereunder. The letter also contained these statements:

> "On July l9, 2018, I arrived at your office at 9:30 a.m. to review the documents requested in [Lloyd's] request letter dated June 26, 2018. At 9:56 a.m., four minutes before the examination under oath was scheduled to begin, Mr. Singh called to say he would be unable to attend the EUO because he was en route from Sacramento to Utah on a driving job. It is obvious from Mr. Singh's call that he was aware of the scheduled time of

action by the invoking party beyond making a written demand: each side must "select a competent and disinterested appraiser." Notwithstanding its vague reference to arbitration in the June 2018 letter, there is no evidence of plaintiff attempting to enforce its rights under the appraisal clause prior to filing this lawsuit.

11.

the EUO. It is also obvious that he knew well before 9:56 a.m. that he would not attend the EUO, given that, based on his representation, he was more than 100 miles from your office when he called.[4] [¶] … [¶]

"Additionally, … I asked that the documents be provided to me as early as possible so that I could review them prior to the EUO. However, no documents were produced prior to the scheduled date of the EUO. Accordingly, I arrived at your office approximately thirty minutes before the EUO start time, but the documents were not produced at that time either. You said that you had received documents from Mr. Singh but had not yet had time to review them. Mr. Singh confirmed on the phone on July 19 that he has documentation related to the purchase price of the subject truck, the date of purchase, and the mileage on the truck at the time of purchase. To the extent these documents were not previously requested, they are being requested now, and should be produced along with all other responsive documents. Please produce the documents as soon as possible, but no later than close of business on Monday, July 23, 2018."

The continued/rescheduled EUO took place on July 30, 2018. Singh personally appeared but failed to produce most of the requested documents. He admitted that he never read the insurance policy and had "no idea" whether it provided coverage for a new engine. Singh further explained that he originally told his insurance broker, "I want to get A-plus [insurance]." He thus assumed the policy covered "everything," including "downtime [and] business losses." Singh also recalled trying to explain to the adjuster, Rogers, that the price of a new engine was "only" about $10,000 more than the price of a used engine.

The EUO concluded with a stipulation, made on the record, that plaintiff would comply with all outstanding document requests by August 3, 2018. The stipulation further indicated that plaintiff's counsel was "working on getting an estimate for a repair of the engine." Plaintiff's counsel also expressly agreed with the following statement made by Lloyd's attorney: "I'll get my office to review the documents that will be received. We'll see if any further examination needs to be done regarding the produced

---

[4] Singh denies intentionally failing to appear. He has attested, "My attorney forget [*sic*] to inform me of the examination under oath until it was about the start on July 19, 2018."

documents, and we'll see if we can resolve the issues between us. And if not, we can proceed with an appraisal."

Plaintiff failed to meet the stipulated deadline for document production. On August 8, 2018, Lloyd's counsel sent another letter to the opposing attorney. As in prior correspondence, it recited the proof of loss clause and asserted plaintiff had violated it. The letter concluded by requesting compliance with the document demand, including documents relating to plaintiff's purchase and ownership of the vehicle, as well as documents concerning the partnership between Singh and the alleged vandal, D.S.[5]

On August 10, 2018, plaintiff produced copies of three documents to Lloyd's counsel by email: (1) the vehicle's title, (2) the check previously sent by ARM in January 2018, and (3) "the notarized deal ending the partnership" between Singh and D.S. No documents were produced concerning the purchase price of the vehicle. Lloyd's counsel had also requested the actual check sent by ARM, not merely a copy, but plaintiff did not return it.

On August 16, 2018, Lloyd's counsel sent a four-page letter to plaintiff's attorney listing the outstanding categories of documents. The letter also summarized "Singh's … pattern of noncooperation with [Lloyd's] investigation of this claim" dating back to August 2017, when Kaney first attempted to inspect the engine. Lloyd's again recited the proof of loss provision and asserted that plaintiff was in breach of its terms. The "Payment of Loss" provision was also quoted. (Some capitalization omitted.) In a separate paragraph, it was noted that "any payment of loss is contingent on the Insured

---

[5] Singh's EUO testimony revealed that D.S. was a principal in the business at the time the vehicle was purchased. Singh also gave inconsistent testimony about the purchase price, initially estimating it was around $26,000 to $28,000, and later purporting to believe it was "roughly $30,000." The pertinent EUO transcript excerpts and Lloyd's subsequent letters show plaintiff did not produce any documents to corroborate those figures. The record of sale, which defendants apparently obtained only after the lawsuit was filed, shows the purchase price was $21,000 before taxes and fees. Plaintiff actually purchased two truck tractors from the auctioneers, but the second vehicle is not at issue.

signing a proof of loss, which Mr. Singh still has not done." The letter concluded by demanding the production of "all previously requested documents no later than August 20, 2018."

Lloyd's counsel allowed a month to pass before issuing a follow-up letter. It was sent on September 19, 2018, and contained these statements: "To date, we have received no responsive documents or even a response to the August 16, 2018 letter. This failure to produce documents follows repeated breaches of the terms of the policy by Mr. Singh. Based on these breaches, [Lloyd's is] hereby denying this claim for failure to cooperate with the express terms of the policy." (Boldface omitted.) As further detailed in the letter, the alleged breaches were (1) "repeatedly frustrat[ing]" defendants' efforts to inspect the vehicle, (2) failure to sign a proof of loss, and (3) "failure to cooperate regarding the [EUO] and production of requested documents." It was noted that Singh testified to possessing, and had agreed to produce, some of the outstanding categories of documents.

On the final page of the letter, Lloyd's counsel wrote, "If Mr. Singh produces the requested documents by October 1, 2018, we will reconsider this denial." Plaintiff ignored the deadline for reconsideration. Prior to filing suit in September 2020, plaintiff retained new legal counsel. Lloyd's and ARM have been represented by the same law firm since June 2018.

**Procedural History**

Plaintiff and Singh filed a civil complaint alleging three causes of action against Lloyd's and ARM. The first cause of action was labeled as "Breach of Contractual Duty to Pay a Covered Claim." (Boldface omitted.) The second and third causes of action alleged two theories of bad faith liability: failure to investigate a claim (the second cause of action) and breach of the implied covenant of good faith and fair dealing (the third cause of action). Punitive damages were sought in connection with the bad faith allegations.

14.

Defendants filed demurrers. Lloyd's additionally petitioned to compel a binding appraisal pursuant to the terms of the policy. The appellate record contains only the rulings on these requests, and it is unclear whether ARM's demurrer challenged all three of plaintiff's causes of action.

An order dated June 24, 2021, shows the trial court sustained ARM's demurrer without leave to amend as to plaintiff's first and third causes of action. As previously indicated, the demurrers of both defendants were sustained without leave to amend as to all causes of action asserted by Singh. The trial court's ruling was based on judicial notice of the fact Singh was "not a party to the [insurance] contract in his individual capacity." In addition, neither plaintiff nor Singh opposed the demurrers.

Lloyd's petition to enforce the appraisal clause was granted, and the action was stayed pending binding arbitration "limited to the determination of the amount of loss incurred under the policy." Despite the stay, defendants were evidently permitted to file an answer to the complaint in November 2022. The arbitration was conducted in July 2023.

In August 2023, the actual cash value of the damage/loss was found to be $20,000. This figure was determined, inter alia, based on the cost of a used/rebuilt engine and accounting for the mileage on the original engine at the time of damage/loss. Following the arbitration, Lloyd's issued a check to plaintiff in the amount of $19,000 based on the correct deductible of $1,000.

In May 2024, defendants jointly filed a motion for summary judgment or, in the alternative, summary adjudication. The contested motion was argued in October 2024, but plaintiff did not include a transcript of the hearing in the record on appeal. In November 2024, the trial court issued a four-page decision granting summary judgment to both defendants.

The trial court found no evidence of any delay by defendants in investigating plaintiff's underlying claim, nor any other breach of Lloyd's contractual obligations. It

15.

rejected plaintiff's argument that defendants behaved inappropriately by attempting to obtain a full settlement and release of liability for only $13,698.90. The court observed that plaintiff did not sign the settlement documents or cash the initial check. It concluded plaintiff's only remaining option was to enforce the appraisal clause, but plaintiff had refrained from exercising that right.

The trial court also concluded there was no evidence that policy benefits were unreasonably withheld. It noted that although Lloyd's document demands were broader than the categories specified in the policy, plaintiff had agreed to produce the requested material. Failure to honor that agreement, "despite multiple reminders to [p]laintiff and notifications that [its] failure constituted a violation of the terms of [the] policy," was held to have "entitled [Lloyd's] to reasonably deny [p]laintiff's claim." Additionally, the court found "that a genuine dispute existed between the parties after December 2017 as to the value of [p]laintiff's claim." (See *Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1072 ["One of the ways an insurer can negate an insured's claim that it has acted unreasonably or without proper cause is to demonstrate the existence of a 'genuine dispute' regarding coverage or the amount or extent of the insured's claimed loss"].)

## DISCUSSION

### Standard of Review

A defendant's motion for summary judgment "tests the existence of evidence" to support the plaintiff's causes of action. (*Columbia Casualty Co. v. Northwestern Nat. Ins. Co.* (1991) 231 Cal.App.3d 457, 468.) The motion should be granted "if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law." (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 415.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

16.

"On appeal, we review the matter independently, resolving in the plaintiff's favor any doubts regarding the propriety of summary judgment." (*Salas v. Sierra Chemical Co.*, *supra*, 59 Cal.4th at p. 415.) "The trial court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its rationale." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878; see *Life v. County of Los Angeles* (1991) 227 Cal.App.3d 894, 899.) Nevertheless, "we 'must presume the judgment is correct, and the appellant bears the burden of demonstrating error.' " (*Tubbs v. Berkowitz* (2020) 47 Cal.App.5th 548, 554.)

**Legal Overview**

"An insurance policy is a contract in which the insurer agrees to pay up to a specified sum should certain losses occur." (*Blue Ridge Ins. Co. v. Jacobsen* (2001) 25 Cal.4th 489, 497.) This case involves " 'first party' coverage[,] i.e., coverage owed by an insurer to cover losses suffered by its own insured …." (*Daun v. USAA Casualty Ins. Co.* (2005) 125 Cal.App.4th 599, 609; accord, *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1192, fn. 14.) "A third party liability policy, in contrast, provides coverage for liability of the insured to a 'third party'…." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 663.)

"An insured can pursue a breach of contract theory against its insurer by alleging the insurance contract, the insured's performance or excuse for nonperformance [of its own obligations under the policy], the insurer's breach, and resulting damages." (*San Diego Housing Com. v. Industrial Indemnity Co.* (1998) 68 Cal.App.4th 526, 536.) The damages element requires a causal connection between the alleged breach and the alleged harm. In other words, a breach without proximate causation of injury is not actionable. (Civ. Code, § 3300; *Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757, 792.) Bad faith claims also require proof of causation. (See *Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 129; *Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 233; CACI Nos. 2331, 2332.)

"The term 'bad faith,' as used in the context of an insured's claim against his or her insurer, is simply a shorthand reference to a claimed breach by the insurer of the covenant of good faith and fair dealing that is implied in every contract of insurance." (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1235.)  "In first party cases, the implied covenant … obligates the insurer to make a thorough investigation of the insured's claim for benefits, and not to unreasonably delay or withhold payment of benefits.  If the insurer 'without proper cause' (i.e., unreasonably) refuses to timely pay what is due under the contract, its conduct is actionable as a tort." (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1209–1210.)

Bad faith liability is ultimately determined by the reasonableness of the insurer's actions in light of the surrounding circumstances.  (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723; *Zubillaga v. Allstate Indemnity Co.* (2017) 12 Cal.App.5th 1017, 1028.)  " 'Ordinarily, reasonableness is a factual issue to be decided by a jury.' [Citation.]  However, the reasonableness of an insurer's conduct 'can be decided as a matter "of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence." ' " (*Bartel v. Chicago Title Ins. Co.* (2025) 111 Cal.App.5th 655, 699.)

Under the genuine dispute doctrine, an insurer is not liable for bad faith even when benefits are erroneously withheld if the mistake was reasonable and based on a genuine dispute regarding the amount or extent of the insurer's liability.  (*Wilson v. 21st Century Ins. Co.*, *supra*, 42 Cal.4th at p. 723; *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 428.)  Summary judgment may be granted on the basis of a genuine dispute if the evidence shows the insurer "fairly and thoroughly evaluated" the plaintiff's claim "and its denial 'was reached reasonably and in good faith.' " (*Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 187.)  " 'On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light

most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' " (*Wilson*, at p. 724.)

**Plaintiff's Second Cause of Action**

Plaintiff's second cause of action is labeled in the complaint as "Bad Faith-Failure to Investigate Claims—As to all Defendants." (Boldface omitted.) This was the only cause of action remaining against ARM following the trial court's demurrer rulings. For the following reasons, ARM and Lloyd's were both entitled to have the claim summarily adjudicated in their favor.

ARM

Plaintiff's notice of appeal only identifies Lloyd's as the defendant/respondent. The civil case information statement filed with this court also identifies Lloyd's as the sole respondent. In its opening brief, plaintiff refers to ARM as a "former defendant," contends ARM "was dismissed from the case pursuant to a granted demurrer," and refers to Lloyd's as the singular "Respondent." In the reply brief, however, plaintiff collectively refers to Lloyd's and ARM as "Respondents."

At oral argument, the attorney for Lloyd's and ARM stated his understanding that both defendants are parties to the appeal. Plaintiff's counsel indicated that the omission of ARM from the notice of appeal was unintentional. ARM will be recognized as a respondent, but plaintiff's nominal challenge to the summary judgment ruling in favor of ARM is rejected. (E.g., *Apex Solutions, Inc. v. Falls Lake National Ins. Co., Inc.* (2024) 100 Cal.App.5th 1249, 1255, fn. 5.) Issues not raised in an appellant's opening brief may be treated as forfeited or abandoned. (*Eck v. City of Los Angeles* (2019) 41 Cal.App.5th 141, 146.) Moreover, the evidence shows the claim against ARM was legally defective.

As discussed, a "bad faith" cause of action is based on the implied covenant of good faith and fair dealing that exists in all contracts. (*Bosetti v. United States Life Ins. Co. in City of New York*, *supra*, 175 Cal.App.4th at p. 1235; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2025) ¶ 12:806.) Plaintiff's second and

19.

third causes of action merely plead two different theories of bad faith liability: failure to investigate and failure to pay a covered claim. (See *Major v. Western Home Ins. Co.*, *supra*, 169 Cal.App.4th at pp. 1209–1210; CACI Nos. 2331, 2332.) Both theories require contractual privity. " 'The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract.' [Citation.] The covenant does not exist independently of the underlying contract." (*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 711–712.)

The uncontroverted evidence shows ARM was a third party administrator, not the insurer. In other words, it was not a party to the insurance contract between plaintiff and Lloyd's. As explained in *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566 (*Gruenberg*), "non-insurer defendants" who are not parties to the insurance agreement do not owe the insured an implied duty of good faith and fair dealing. (*Id*. at p. 576.) Without the necessary contractual relationship, the claim against ARM fails as a matter of law. "Even if they are responsible for the insurer's decision[s] …, *no bad faith action lies* against the insurer's officers, agents, and employees (e.g., adjusters, investigators, [and] claims managers … )." (Crosky et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:98, citing *Gruenberg*, at p. 576 & *Cooper v. Equity Gen. Ins. Co.* (1990) 219 Cal.App.3d 1252, 1258–1260.)

The pleadings frame the issues to be decided on summary judgment. (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.) As such, "the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings." (*Ibid*.) Plaintiff's second cause of action is exclusively based on a theory of bad faith liability and, in pertinent part, the allegation it "suffered a loss covered under the [p]olicy issued by [d]efendants." The evidence shows, however, that ARM did not issue the policy and was

20.

not a party to that agreement. Because plaintiff did not plead alternative theories of liability against ARM, "we need not consider the possibility that [it] may have committed another tort …." (*Gruenberg*, *supra*, 9 Cal.3d at p. 576.)

Lloyd's

Plaintiff makes almost no effort to dispute Lloyd's entitlement to summary adjudication on the second cause of action. Its only argument, made in a single sentence on page 29 of the opening brief, is that Lloyd's should have invoked the appraisal clause sometime between December 2017 and September 2018. The contention is insufficiently developed and could be rejected for that reason alone. (See *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["We are not required to examine undeveloped claims or to supply arguments for the litigants"]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 ["Although our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in plaintiffs' brief"].)

The trial court correctly observed that nothing in the policy required Lloyd's to invoke the appraisal clause prior to, or in lieu of, pursuing other forms of investigation. Under the terms of the policy, a condition precedent for the appraisal process is "the written demand of either [party]." Plaintiff could have unilaterally enforced the appraisal clause at any time, but it refrained from doing so even after retaining legal counsel.

Furthermore, the evidence shows plaintiff was not truly disputing the actual cash value of its loss but rather the extent of its coverage under the policy. " '[A]ctual cash value' " coverage relates to the fair market value of the insured property at the time of damage or loss. (*Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 462.) Plaintiff's insurance policy only required Lloyd's to pay the actual cash value of the vehicle or its damaged parts, minus a deductible. (See, e.g., *George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1128–1129.) Lloyd's agent (ARM) tried to explain this concept to plaintiff, but plaintiff maintained it was entitled to a "brand-new" engine.

21.

It cannot be disputed that the actual cash value of a used engine with nearly 400,000 miles on it is significantly less than a new engine of like kind. Therefore, the actual cash value of the insured vehicle at the time of loss, with a nearly 400,000-mile engine, had to be less than the actual cash value of the same vehicle with a new engine. Unsurprisingly, the arbitration finding of a $20,000 loss was (1) based on the cost of replacing the damaged engine with a used/rebuilt engine and (2) a sum less than the amount plaintiff paid for the vehicle (approx. $23,000) when the original engine had lower mileage. Lloyd's had a duty to investigate the actual cash value of the damage/loss, and it performed that duty. The nature and scope of plaintiff's coverage was a separate issue.

In a message sent to plaintiff in December 2017, Lloyd's adjuster wrote, "Your truck is a 2012 and does not warrant a 2017 engine. I have explained your policy being an Actual Cash Value previously, and will be happy to do so again." Plaintiff's insurance broker was copied on this message and other messages exchanged between plaintiff and the adjuster. It appears plaintiff did not speak to its broker about the issue, and plaintiff later admitted to never reading the policy. "A reasonable person will read the coverage provisions of an insurance policy to ascertain the scope of what is covered." (*Hallmark Ins. Co. v. Superior Court* (1988) 201 Cal.App.3d 1014, 1019.)

After plaintiff retained counsel and expanded its claim to a $100,000 demand for a new engine *and* loss of business income, Lloyd's conducted a further investigation. During plaintiff's EUO, Lloyd's counsel attempted to determine the basis for its claimed entitlement to certain benefits as asserted in the June 2018 demand letter. Plaintiff's representative, Singh, confirmed that the letter's reference to " 'supporting documentation clearly demonstrat[ing] a total loss [of] $35,778' " was based on the cost of a new engine as estimated by the mechanic in Sacramento. Singh also revealed that plaintiff's position was entirely based on the assumption its broker had procured "A-plus" insurance coverage.

22.

There is no evidence that would permit a trier of fact to reasonably conclude Lloyd's did not make prompt and extensive efforts to investigate plaintiff's claim for benefits under the policy as tendered in July 2017 and revised in June 2018. Plaintiff has not met its burden to demonstrate error in the motion ruling as to the second cause of action.

**Plaintiff's First and Third Causes of Action**

Plaintiff's first and third causes of action respectively allege breach of contract and bad faith. According to the complaint, Lloyd's breached the contract by failing to pay "the policy limits." The theory of bad faith is an unjustified failure to pay "the policy benefits."

We will briefly restate the legal requirements for both causes of action. "The elements of a breach of contract claim are that a contract was formed; that the plaintiff did everything required by the contract; that the defendant did not do something required by the contract; and that the plaintiff was harmed as a result." (*CSAA Ins. Exchange v. Hodroj* (2021) 72 Cal.App.5th 272, 276.) "To establish a bad faith claim, the insured must show that (1) benefits due under the policy were withheld and (2) the reason for withholding the benefits was unreasonable or without proper cause." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 949.)

" 'Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain.' " (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 909.) Put differently, the evidence must show "the breach was a substantial factor in causing the damages." (*Ibid*.) "Generally speaking, to be actionable, harm must constitute something more than ' "nominal damages, speculative harm, or the threat of future harm—not yet realized …." ' " (*Buttram v. Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520, 531, fn. 4.)

Breach of Contract

Plaintiff argues Lloyd's breached the insurance contract in two ways. First, by erroneously applying a deductible of $2,500 to calculate its net settlement offer of $13,698 (rounded) when the correct deductible was $1,000. Second, by denying plaintiff's claim in September 2018 without paying any benefits.

Whether it was done innocently or in bad faith, Lloyd's use of the wrong deductible in its settlement offer is immaterial because the evidence does not permit a finding of "resulting damages." (*San Diego Housing Com. v. Industrial Indemnity Co.*, *supra*, 68 Cal.App.4th at p. 536.) Having admitted it never read the policy, there is no evidence plaintiff was aware of the correct deductible. The attorney who represented plaintiff in 2018 apparently overlooked the discrepancy himself because there is no evidence that the issue was ever raised prior to the filing of this lawsuit in September 2020.

Plaintiff's own evidence shows it rejected Lloyd's earlier proposed net settlement offer of $15,198 (rounded), which was calculated using the correct deductible of $1,000. The declaration of Singh, filed in support of plaintiff's opposition to the motion for summary judgment, explains the earlier offer was made in a letter dated December 7, 2017. The letter is attached to Singh's declaration as an exhibit, and it shows the gross estimated settlement figure of $16,198 before application of a deductible. Singh's declaration states, "After receiving the December 7, 2017 letter, I informed Defendants that I believed the estimate was too low."

Plaintiff rejected all of Lloyd's settlement offers, and there is no evidence it relied on the misstated deductible in any way. What the evidence shows is plaintiff's unwillingness to settle the claim for anywhere close to the figures calculated with either deductible because it believed, in Singh's words, "that repairs would cost much more than the $16,198.00 offered." The misstated deductible does not present a material

triable issue because the evidence would not permit a trier of fact to find causation of harm.

Plaintiff's second theory of breach, as asserted on appeal, is different from the theory stated in the complaint. The complaint alleges, "Defendants failed to properly investigate the claim and pay the loss. [¶] … The amount of the loss that [d]efendants failed to pay is approximately $45,000.00, the policy limits of the [p]olicy." We have already discussed the lack of evidence to support the failure-to-investigate allegation. As for the remaining contention, plaintiff does not explain how the evidence would permit a finding that Lloyd's was contractually obligated to pay "the policy limits."[6]

Plaintiff now contends Lloyd's "breached the [p]olicy by wrongfully denying coverage in September 2018." Lloyd's responds that plaintiff's nonperformance of its own obligations defeats the second essential element of the claim, i.e., "that the plaintiff did everything required by the contract." (*CSAA Ins. Exchange v. Hodroj*, *supra*, 72 Cal.App.5th at p. 276.) Lloyd's does not use the term "condition precedent" in its briefing, but the crux of its argument is that such conditions were not met. "A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." (Civ. Code, § 1436.)

Lloyd's argues four theories of nonperformance by plaintiff: (1) failure to allow "reasonable time and opportunity to examine" the insured vehicle as required by the "Inspection of Loss or Damage" clause; (2) failure to "cooperate" with respect to the EUO requirement of the "Proof of Loss" clause; (3) failure to comply with the document production requirement of the "Proof of Loss" clause; and (4) failure to submit a signed and sworn proof of loss statement as required by the "Proof of Loss" and "Payment of

---

[6] Although the policy limit for property damage was $40,000 per claim, it appears plaintiff further relied on a separate $5,000 limit for towing and storage costs.

Loss" clauses. (Some capitalization omitted; all further references to these clauses will partially omit capitalization.)

The parties extensively debate whether the evidence shows plaintiff caused delays in the inspection of the damaged engine. It is unnecessary to reach that issue. Plaintiff's failure to tender a sworn proof of loss statement is dispositive, but the EUO and document production defenses will also be discussed.

At this point it is necessary to address a related issue of forfeiture. In its opening brief, plaintiff argues Lloyd's had a burden to show it was " 'substantially prejudiced' " by plaintiff's own breaches of the policy. Plaintiff relies on a single case, *Campbell v. Allstate Ins. Co.* (1963) 60 Cal.2d 303 (*Campbell*), and does little more than quote two sentences from the opinion. Lloyd's correctly argues plaintiff forfeited this issue by failing to raise it below.

Appellate courts have discretion to resolve forfeited claims involving a question of law arising from undisputed facts. (*Wisner v. Dignity Health* (2022) 85 Cal.App.5th 35, 44.) "There is no rule, however, that an appellate court *must* consider a pure question of law raised for the first time on appeal." (*Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 898–899.) "Though this court is bound to determine whether defendants met their threshold summary judgment burden independently from the moving and opposing papers, we are not obliged to consider arguments or theories, including assertions as to deficiencies in defendants' evidence, that were not advanced by plaintiffs in the trial court." (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.)

In addition to not being raised below, plaintiff's argument is poorly developed. The *Campbell* opinion was decided in an entirely different factual and procedural context, and plaintiff neither acknowledges the distinctions nor attempts to show why *Campbell*'s holding should apply here. Those circumstances weigh against excusing the forfeiture.

26.

In *Campbell*, injured third party plaintiffs sued "to compel [the] defendant insurer to pay a default judgment they had obtained against its insured." (*Campbell*, *supra*, 60 Cal.2d at p. 304.) The insurer attempted to assert the defense of noncooperation by the policyholder to avoid liability to the plaintiffs. Although the insured had notified the insurer about the underlying car accident, he ignored subsequent correspondence from the insurer and provided no additional information. When the injured parties sued the insured directly, the insured "did not communicate with [the insurer] or answer the complaint, and a default judgment was secured." (*Id*. at p. 305.) The insured's conduct was a breach of his personal obligations under the terms of the insurance policy. (*Id*. at pp. 304–305.)

As previously noted, there are differences between "first party" and "third party" insurance coverage and lawsuits. "Whereas first party coverage obligates the insurer to pay damages claimed by the insured itself, third party coverage obligates the insurer to defend, settle, and pay damages claimed by a third party against the insured." (*Pitzer College v. Indian Harbor Ins. Co.* (2019) 8 Cal.5th 93, 107.) If an injured third party obtains a judgment against an insured tortfeasor, the third party may bring a subsequent action "against the insurer on the policy and subject to its terms and limitations … to recover on the judgment." (Ins. Code, § 11580, subd. (b)(2).) In the "third party" context described above, the *Campbell* opinion holds, "An insurer may assert defenses based upon a breach by the insured of a condition of the policy such as a cooperation clause, but the breach cannot be a valid defense unless the insurer was substantially prejudiced thereby." (*Campbell*, *supra*, 60 Cal.2d at p. 305.)

Although broadly worded, the *Campbell* holding is based on a line of cases decided under the same procedural posture: a third party action against an insurance company to recover the amount of a judgment previously obtained against the insured. (*Campbell*, *supra*, 60 Cal.2d at pp. 305–306, citing *Hynding v. Home Acc. Ins. Co.* (1932) 214 Cal. 743; *Wormington v. Associated Indemnity Corp.* (1936) 13 Cal.App.2d 321;

27.

*Jensen v. Eureka Casualty Co.* (1935) 10 Cal.App.2d 706; *Norton v. Central Surety &*
*Ins.* Co. (1935) 9 Cal.App.2d 598*; Panhans v. Associated Indemnity Corp.* (1935)
8 Cal.App.2d 532.)  The holding merely paraphrases and reaffirms the "well settled [rule]
that the violation by an insured of the conditions of a [cooperation] clause … is not a
valid defense against the injured party unless in the particular case it appears that the
insurance company was substantially prejudiced thereby." (*Norton*, at p. 601; accord,
*Hynding*, at p. 752.)  In this context, the insured's duty of cooperation "means that he
shall make a fair and frank disclosure of information reasonably demanded by the insurer
to enable it to determine whether there is a genuine defense" (*Norton*, at p. 606) and
participate as necessary in any related legal proceedings (*Hynding*, at p. 752).

The *Campbell* rule serves "the public policy of this state to provide compensation
for those negligently injured in automobile accidents through no fault of their own .…"
(*Campbell*, *supra*, 60 Cal.2d at p. 307.)  It is necessary in third party lawsuits because an
injured third party has no control over the insured tortfeasor's dealings with their
insurance company.  The rule also safeguards against "the possibility of collusion
between the [insured] and the insurance company, to defeat the rights of the injured
party." (*Hynding v. Home Acc. Ins. Co.*, *supra*, 214 Cal. at p. 751.)  Accordingly, the
insurer must show it "was prejudiced by the failure of the insured to *cooperate in his*
*defense*" against the claim of the injured third party, i.e., "that if the cooperation clause
had not been breached there was a substantial likelihood the trier of fact would have
found *in the insured's favor*." (*Billington v. Interinsurance Exchange* (1969) 71 Cal.2d
728, 737, italics added.)

Plaintiff cites no authority for applying *Campbell*'s prejudice rule in a first party
action brought by an insured against its own insurer.  The issue of *Campbell*'s
applicability has occasionally arisen in other first party cases, but courts have declined to
resolve it.  (E.g., *Abdelhamid v. Fire Ins. Exchange* (2010) 182 Cal.App.4th 990, 1007.)

Since the parties in the present appeal have not even briefed this issue, plaintiff's forfeiture will not be excused.

Returning to the arguments preserved for appeal, we first consider Lloyd's reliance on the EUO provision of the "Proof of Loss" clause. The provision reads as follows: "[Plaintiff], as often as required, shall submit to examination under oath by any person designated by [Lloyd's] and subscribe the same." In its motion papers, Lloyd's relied on *Brizuela v. CalFarm Ins. Co.* (2004) 116 Cal.App.4th 578 (*Brizuela*) to argue plaintiff's "failure to appear at the first EUO" provided an "absolute defense" to the breach of contract action. (Boldface and underscoring omitted.) Lloyd's does not cite *Brizuela* in the respondent's brief, and it now contends plaintiff "failed to cooperate during the EUOs." (Boldface omitted.)

The *Brizuela* opinion holds "that compliance with [a] policy requirement for an examination under oath is a condition precedent to any claim, and the *refusal* to submit to such an examination causes a forfeiture of any rights under the policy." (*Brizuela*, *supra*, 116 Cal.App.4th at p. 590, italics added.) There, the insurer's denial of a claim followed an extended period of fruitless EUO demands and meet-and-confer efforts. (*Id.* at pp. 583–585.) The insured party's "failure, six months after [the insurer's] initial request for the examination, to propose any dates for an examination, to respond in a timely manner to [the insurer's] proposed dates, and to submit to an examination constituted a refusal to submit to examination under oath." (*Id.* at p. 589.)

It is settled "that a claim for policy benefits may be denied as a consequence of failing to submit to a policy condition for examination under oath." (*Brizuela*, *supra*, 116 Cal.App.4th at p. 590; e.g., *California Fair Plan Assn. v. Superior Court* (2004) 115 Cal.App.4th 158, 166–167.) "Neither can it be questioned that the refusal of the insured to answer material questions at an examination under oath" may justify the denial of a claim. (*Robinson v. National Automobile & Casualty Co.* (1955) 132 Cal.App.2d 709, 716.) Lloyd's evidence does not establish either circumstance.

29.

Plaintiff's representative, Singh, admittedly failed to appear in person at the originally scheduled EUO, but he did answer questions over the telephone. The stenographer's transcript of the proceeding is approximately 50 pages in length. Singh personally appeared for the rescheduled EUO less than two weeks later. The transcript from the second proceeding is approximately 252 pages. Lloyd's does not allege that Singh refused to answer any questions. Under these circumstances, the evidence does not demonstrate a material breach of plaintiff's obligations under the EUO provision.

The Proof of Loss clause further required plaintiff to "produce for examination all books of accounts, bills, invoices, and other vouchers." Although it complied with some of Lloyd's document demands, plaintiff contends "none of the documents requested by [Lloyd's] were books of accounts, bills, invoices, or vouchers." Lloyd's responds by arguing the phrase "other vouchers" meant all other documents supporting the claim of loss. The trial court generally agreed that the categories of requested material exceeded what was required under the policy, but it also noted plaintiff's failure to object and its voluntary agreement to comply with the requests. Plaintiff's agreement does bolster Lloyd's position on the bad faith cause of action (see further discussion, *post*), but it does not necessarily show a contractual breach. We need not resolve this issue, however, because plaintiff indisputably failed to submit the required proof of loss statement.

The "Proof of Loss" clause states, in relevant part: "Within sixty (60) days after loss or damage, unless such time is extended in writing by [Lloyd's], [plaintiff] shall forward to [Lloyd's] a statement, signed and sworn to by [plaintiff], stating the place, time and cause of the loss or damage, the interest of [plaintiff] and of all others in the property, the sound value thereof and the amount of loss or damage thereto, all encumbrances thereon and all other insurance, whether valid and collectable or not, covering said property." The separate "Payment of Loss" clause states, "The loss shall in no event become payable, until sixty (60) days after the verified proof of loss herein required shall have been received by [Lloyd's]…." This language unambiguously made

30.

plaintiff's submission of a conforming "signed and sworn" statement a condition precedent to Lloyd's duty to tender payment for any losses covered by the policy.

Under section 554 of the Insurance Code, Lloyd's failure to enforce the 60-day deadline in the "Proof of Loss" clause may have resulted in a waiver of its right to withhold benefits on grounds of a "[d]elay in the presentation" of the statement, but it would not have precluded enforcement of the "Payment of Loss" clause. The Insurance Code also provides for a waiver, under certain circumstances, of "defects" in a proof of loss statement required under the terms of a policy. (Ins. Code, § 553.) But plaintiff has never alleged such a waiver, nor would it be possible to allege a mere defect when no statement was ever provided.

In *Abdelhamid v. Fire Ins. Exchange*, *supra*, 182 Cal.App.4th 990, the insured plaintiff's deficient proof of loss statement was held to constitute a material breach entitling the defendant insurer to summary adjudication of the plaintiff's contract claim. (*Id*. at pp. 999–1000.) The insured made a " 'substantial performance' " argument on appeal, which was rejected. (*Id*. at p. 1000.) Here, plaintiff completely failed to submit a proof of loss statement. A "total failure to comply" with "proof of loss conditions will excuse insurer liability due to the failure of a condition precedent." (*1231 Euclid Homeowners Assn. v. State Farm Fire & Casualty Co.* (2006) 135 Cal.App.4th 1008, 1018.)

Plaintiff argues it was not obligated to sign the proof of loss statement prepared by Lloyd's in December 2017 because the document contained settlement and release language. This is true. The policy does not require execution of a settlement and release in order to comply with the "Proof of Loss" and "Payment of Loss" conditions. Plaintiff is wrong, however, in its further contention that its obligations under the relevant provisions were excused because "no statement of loss without any settlement language was ever presented to [it] to sign."

31.

The insurance contract does not require plaintiff to execute a proof of loss statement *prepared and presented* by Lloyd's. The contract only requires "a statement, signed and sworn to by [plaintiff]," containing the information specified in the "Proof of Loss" clause. Under the separate "Payment of Loss" requirement, a claimed loss "shall in no event become payable" until Lloyd's receives "the verified proof of loss" described in the immediately preceding clause.

Plaintiff's ability to comply with the proof of loss requirement by preparing its own document is confirmed by other parts of the policy. In addition to providing comprehensive coverage on the vehicle, the policy also insured a trailer and protected against liability for damaged cargo. The coverages had separate terms and conditions. To make a claim for cargo loss, the policy required plaintiff to execute and return "a proof of loss statement *in the form supplied by [Lloyd's]*." (Italics added.) The italicized language is noticeably absent from the similarly worded provision in the "Proof of Loss" clause for the vehicle coverage.

Between June 26 and August 16, 2018, Lloyd's counsel sent at least four letters to plaintiff's attorney, each containing a citation to, and full recital of, the "Proof of Loss" clause. The last of those letters also cited and quoted the "Payment of Loss" clause, followed by this statement: "Thus, any payment of loss is contingent on the Insured signing a proof of loss, which Mr. Singh has still not done." Note the words "*a* proof of loss." (Italics added.) The submission of "a signed and sworn statement" containing all information specified in the "Proof of Loss" clause was a condition entirely within plaintiff's own ability to perform. Plaintiff chose not to fulfill the obligation. The August 16 letter requested production of all outstanding documents by August 20, 2018. Plaintiff did not respond to the letter and stopped communicating with Lloyd's counsel.

A signed proof of loss statement was a condition precedent to Lloyd's obligation to issue any payment for a claimed loss. Lloyd's evidence showed plaintiff did not comply, or even attempt to comply, with that condition. Lloyd's thus negated an

32.

essential element of plaintiff's claim (the performance or excused nonperformance of its own contractual obligations), and demonstrated entitlement to summary adjudication on the first cause of action. (See, e.g., *Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1192 [affirming summary judgment based on the plaintiff's "failure to perform a condition precedent"].)

Bad Faith

Lloyd's defense against the breach of contract claim does not necessarily defeat plaintiff's cause of action for bad faith. An insurer's duties under the implied covenant of good faith and fair dealing are "unconditional and independent of the performance of plaintiff's contractual obligations." (*Gruenberg*, *supra*, 9 Cal.3d at p. 578.) Therefore, "the nonperformance by one party of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing by the other party while the contract between them is in effect .…" (*Id*. at p. 578.)

Plaintiff observes that Lloyd's never denied the existence of coverage for the damaged engine and had been willing to pay the covered portion of its claim. But in September 2018, instead of merely standing firm on its previous offer, Lloyd's denied the claim entirely. Lloyd's eventually tendered the actual cash value of the loss as determined in binding arbitration, but not until after plaintiff filed this lawsuit. This raises the question of whether Lloyd's acted in bad faith by denying the claim altogether rather than keeping its prior offer open or making further efforts to reach a settlement.

Although the outright denial of its claim in September 2018 is plaintiff's strongest argument, plaintiff's briefing focuses on Lloyd's settlement offer in December 2017. The offer was contingent on plaintiff signing a proof of loss document that contained settlement and release language. Plaintiff contends the document was "a settlement in disguise," but there was nothing secretive about it. Lloyd's adjuster described the material enclosed with his correspondence as "settlement documents." However, the adjuster also stated in writing, "Signing those documents, and returning them will not bar

you from any future recovery." The adjuster later claimed, in a sworn declaration, that the quoted statement was meant to convey "that signing the Proof of Loss and accepting the undisputed amount would not bar [plaintiff] from future recovery of disputed amounts should coverage be found."[7]

Plaintiff argues the adjuster's statement regarding the effect of signing the release was false or misleading. It thus contends "[t]here is a dispute of material fact as to whether [defendants] were trying to pull a fast one on [Singh] by having him sign the proof of loss and/or cash the check." Once again, plaintiff either overlooks or fails to understand the requirement of actual damages and causation thereof. (*Vu v. California Commerce Club, Inc.*, *supra*, 58 Cal.App.4th at p. 233.)

"An insurer's tortious breach of the implied covenant of good faith and fair dealing makes the insurer liable for all damages that are *a proximate result* of that breach." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 533, italics added.) Singh was leery of the settlement documents and has attested he "did not feel comfortable signing [them]." When defendants tendered payment in January 2018, plaintiff did not cash the check and instead retained legal counsel. The attorney sent a letter to defendants on plaintiff's behalf demanding a $100,000 settlement. As discussed in footnote 3, *ante*, the attorney wrote that if the demand was rejected and the dispute went to arbitration, plaintiff would "*not* execute a release of all claims." (Italics added, underscoring omitted.) It is undisputed plaintiff never accepted Lloyd's settlement

---

[7] Defendants repeatedly used, and continue to use, the phase "undisputed amount" in reference to Kaney's roughly $16,000 estimate of the actual cash value of the insured property at the time of loss. Plaintiff obviously *did not* agree that this was the amount to which it was entitled. We can only surmise defendants' use of the term "undisputed" was impliedly based on the policy's appraisal clause, which established the procedure to be followed if the parties "fail[ed] to agree as to the amount of loss or damage," and the fact plaintiff never exercised its rights under that clause.

offers, and there is no evidence of detrimental reliance by plaintiff in relation to Lloyd's efforts to obtain a settlement and release in 2017.

The remaining issue is Lloyd's denial of the claim in September 2018. The complaint alleges the denial was "inexplicabl[e]." In its briefing, plaintiff alleges "that instead of engaging in an interactive process with [it] regarding the disputed amount [of loss], [Lloyd's] decided to just deny the claim all together [*sic*] without justification." The undisputed evidence tells a different story.

Lloyd's investigated the actual cash value of the insured property, determined the amount to be $16,198 (rounded), and tendered a payment for the claim based on that estimate. The amount tendered was incorrectly calculated using the wrong deductible, but the misstated deductible was not a factor in plaintiff's rejection of the payment. Ignoring the pertinent question of the actual cash value to which it was entitled, plaintiff demanded the installation of a new engine at an estimated cost of $36,000. Moreover, plaintiff threatened to sue Lloyd's based on its supposedly "unreasonable estimate[]." It would later be determined, conclusively, that the actual cash value of the loss was $20,000.

Sworn statements by Singh confirm plaintiff stopped communicating with defendants after Lloyd's tendered payment in January 2018. Plaintiff kept the check but did not cash it, and it retained the services of a lawyer. Approximately five months later, the lawyer sent a letter demanding $100,000. The letter alleged a "total loss" of the insured property in the amount of $35,778.09, which plaintiff would later confirm was based on an estimate it had obtained for installation of a "brand-new" engine.

Lloyd's investigated plaintiff's revised claim by scheduling an EUO and requesting documents concerning, inter alia, the purchase price of the vehicle, ownership of the vehicle, and repair and maintenance of the vehicle. Other document demands sought evidence of plaintiff's communications with its mechanic in Sacramento and with Singh's former business partner, D.S. The categories of requested material were not

35.

arbitrary. Lloyd's motion papers use the phrase "highly questionable claim" and imply it suspected the possibility of fraud or deception.

During plaintiff's EUO, Singh overstated the purchase price of the vehicle and underestimated its mileage, both at the time of purchase and on the date of loss. There was inconclusive testimony regarding when Singh first suspected or discovered a problem with the engine, and when he first contacted his mechanic in Sacramento about it. Singh's testimony also raised questions about whether his former business partner, D.S., had an ownership interest in the vehicle.

The stipulation entered into by plaintiff and Lloyd's at the conclusion of the second EUO shows the parties were discussing the possibility of a settlement. At that point, Lloyd's tender of payment for the covered loss had been rejected and Lloyd's counsel had asked Singh to return the uncashed check. Lloyd's evaluation of the case, from a settlement standpoint, was partially dependent upon the contents of the outstanding documents, which plaintiff agreed to produce by August 3, 2018. Plaintiff, despite its existing demand of $100,000, was purportedly "working on getting [a new] estimate for a repair of the engine." The stipulation concluded with defense counsel stating, "[W]e'll see if we can resolve the issues between us. And if not, we can proceed with an appraisal." Plaintiff's counsel said, "So stipulated."

It was fully within plaintiff's ability and control to enforce the appraisal clause if it did not wish to negotiate further with defense counsel. The evidence indicates, and plaintiff does not dispute, that plaintiff stopped communicating with Lloyd's after August 10, 2018. A letter from Lloyd's dated August 16, 2020, making a final request for document production within four days, went unanswered. This letter set forth the history of plaintiff's repeated failure to honor stipulated deadlines to provide documents it had already agreed to produce.

Previously, after Lloyd's tendered payment for the original claim in January 2018, plaintiff went silent for five months before issuing the $100,000 settlement demand.

How long was Lloyd's supposed to wait for plaintiff to resume communication this time? On September 19, 2018, after nearly six weeks of inactivity and radio silence, Lloyd's issued its denial of the claim. The denial letter stated a willingness to reconsider if plaintiff produced the outstanding documents by October 1, 2018, but the final deadline was also ignored. In short, it was *plaintiff* who "inexplicably" abandoned the "interactive process."

To reiterate, Lloyd's did tender payment for the claim submitted by plaintiff in July 2017. Plaintiff rejected the payment and instead demanded $100,000. Plaintiff's demand letter alleged bad faith in the form of undue delay and failure "to resolve [the earlier claim] on reasonable terms." As of June 2018, and continuing through September of that year, plaintiff was claiming entitlement to benefits and compensation far beyond what was covered by the policy (e.g., a new engine and recovery of lost business income). Plaintiff also threatened that if Lloyd's did not pay the $100,000 and the case went to arbitration, plaintiff would not sign a release. In other words, Lloyd's would still be sued for bad faith. (See fn. 3, *ante*.)

The evidence shows the existence of genuine dispute, at the time Lloyd's issued its denial letter, as to the nature and extent of plaintiff's insurance coverage, and the amount due under the policy. (Cf. *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 349–350.) A reasonable trier of fact could not reach a different conclusion. As such, the trial court properly applied the genuine dispute doctrine to the bad faith cause of action. (See *id*. at p. 350.)

Furthermore, an insurer's reliance on the advice of counsel can "negate[] allegations of bad faith and malice as it tends to show the insurer had proper cause for its actions." (*State Farm Mut. Auto. Ins. Co. v. Superior Court* (1991) 228 Cal.App.3d 721, 725.) The insurer is not required to plead such reliance as an affirmative defense in its answer. (*Ibid*.) From June 2018 onward, all of Lloyd's dealings with plaintiff were

exclusively by and through its legal counsel, including the denial of plaintiff's claim in September 2018.

Pursuant to the foregoing analysis, we conclude the trial court properly granted Lloyd's motion for summary judgment.  Plaintiff has not met its burden to demonstrate reversible error.

## DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.


PEÑA, Acting P. J.

WE CONCUR:


DESANTOS, J.


HARRELL, J.